437 A.2d 44

**COMMONWEALTH of Pennsylvania,**

v.

**David SHERIDAN, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 5, 1980.

Filed Nov. 13, 1981.

Petition for Allowance of Appeal Granted
April 30, 1982.

280

Gaele McLaughlin Barthold, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before BROSKY, JOHNSON and POPOVICH, JJ.

BROSKY, Judge:

Appellant was convicted at a non-jury trial of burglary,[1] possessing instruments of crime,[2] carrying firearms on a public street,[3] and criminal trespass.[4] Sheridan filed post-verdict motions which were denied. He was sentenced to serve a term of imprisonment lasting one to ten years for burglary, a concurrent sentence of one to three years for possessing instruments of crime, a concurrent sentence of one to two years for carrying firearms on a public street and a concurrent sentence of one to three years for criminal trespass. This appeal followed. We affirm the decision of the trial court.

In the early morning, 2:50 a. m., of March 19, 1979, Robert Waters was awakened from his sleep at his apartment at 2008 Pine Street, Philadelphia, by a "rustling noise." A person was at the foot of his bed. That person, a man, approached Walters, pointed a gun at him, and walked away. The police were contacted as soon as the intruder departed.

1. 18 Pa.C.S. § 3502.

2. 18 Pa.C.S. § 907.

3. 18 Pa.C.S. § 6108.

4. 18 Pa.C.S. § 3503.

A radio dispatch was sent out by the police to search for a black male, 5 feet 8 inches tall, wearing a white raincoat and a cap. The man was possibly armed. He was last seen at 2008 Pine Street minutes ago. Within two or three minutes, the police came upon a black man, about 5 feet 8 inches tall wearing, a full-length tan overcoat and no hat. There was no one else on the street. It was now nearly 3:00 a. m.

The policeman called over the appellant to his car and asked him where he was going. Appellant said nothing. The officer asked him again and Sheridan said nothing. The officer then frisked the appellant and discovered a .32 caliber revolver on him. He then asked Sheridan if he had a permit to carry the gun. Sheridan did not answer. The policeman then continued his search of appellant and discovered two wallets, one bearing another person's name and the address 2008 Pine Street.

Sheridan presents two questions for our consideration. First, was the stop, frisk, search and seizure supported by adequate, reasonable grounds to so act? We hold that the police had reasonable grounds to stop and question the appellant. That questioning provided them with sufficient suspicious circumstances when coupled with their knowledge that the appellant may be armed to conduct a *Terry* search.[5] And, finally, evidence properly obtained from that search provided the policeman with sufficient probable cause to arrest the appellant.

Thus, our analysis is presented in a manner involving three levels of scrutiny. First, we focus upon the circumstances of the search to determine if "some intermediate response" was warranted. *Commonwealth v. Daniels*, 280 Pa.Super. 278. 421 A.2d 721 (1980).[6]

5. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

6. We do not hold that the appellant waived the issue related to the search because he did not specifically state his claim related to the radio message. He attacked the police's authority to arrest the appellant in his post-verdict motions and the trial court reviewed the authority of the police to act pursuant to the information radioed to them.

In *Commonwealth v. Lovette*, 271 Pa.Super. 250, 253, 413 A.2d 390, 391 (1979), we said:

Appellant does not actively contend that the police officer was not permitted to stop and detain him briefly for identification. Nor does appellant assert that the police lacked probable cause to arrest him once the hat had been identified. Rather he contends that probable cause was lacking when the officer drove appellant to the burglarized house. Appellant identifies the officer's placing him in the patrol wagon as the time of the arrest, because he was subject to the control of the officer.

While we accept that appellant was required to accompany the officer for the one and one-half block trip, we disagree with his conclusion that in order to do so the police were required to have the same quantum of proof necessary to support a full-blown arrest. We are not faced with the aspects of such an arrest but, rather, with an identification procedure by which the officer could determine whether there was probable cause to arrest appellant and formally charge him with the criminal offenses. Instead of arresting appellant, the officer made an intermediate response by transporting appellant and the property a short distance for identification. Intermediate responses previously have been approved by the courts of this Commonwealth. *Commonwealth v. Le-Seuer*, 252 Pa.Super. 498, 382 A.2d 127 (1977); *Commonwealth v. Harper*, 248 Pa.Super. 344, 375 A.2d 129 (1977), as guided by the Supreme Court decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The officer in this case was reluctant to let appellant free to leave as neither appellant nor his companions had identified themselves; and the hat, as evidence, could easily be destroyed or concealed. At the same time, the officer was reluctant to arrest appellant on the basis of the information known to him at this time. Rather than force the officer to choose between such opposite responses, this court sanctions the use of an

intermediate response such as the one used in this case. See also *Commonwealth v. Harper*, supra. Obviously, once the hat had been identified, the officer had the requisite information to arrest appellant. *Commonwealth v. Jones*, 457 Pa. 423, 428, 322 A.2d 119 (1974). Accordingly, we find no error in the court's refusing to suppress evidence demonstrating that the hat had been stolen.

We indicated in *Commonwealth v. Lovette*, supra, that the police possessed a reasonable suspicion to stop, question and transport Lovette once they had seen him one and one-half blocks from the scene of the crime, identified that he wore a hat similar to that described to police and that he had muddied shoes, which all occurred at 3:15 p. m.

■ Here, the police discovered a black man, *without* a hat the actor was described to have been wearing, an overcoat, not a raincoat, different in color from that described to the police, three blocks from the scene at 3:00 a. m. We believe the facts herein justified the police in stopping the appellant. While there was little evidence to connect him with the crime, the fact that the encounter between the police and the appellant occurred at 3:00 a. m. when the Commonwealth argues few persons would be in or near the geographical area in which the crime occurred when coupled with the evidence police had, these facts were sufficient to legitimize the stop. See also: *Commonwealth v. Kazior*, 269 Pa.Super. 518, 525, 410 A.2d 822, 825 (1979).

The circumstances found in this case are not unusual. The record discloses that the police radioed a message that a black man wearing a white raincoat was reported to have committed a burglary at 2008 Pine Street, Philadelphia. The police discovered a man three blocks from the scene of the crime who was black and was wearing a tan overcoat. This encounter occurred at 3:00 a. m. The police stated that no one else was seen on the street. We believe that when the policeman viewed a man, generally fitting the description of the alleged criminal, seen on a street where no other persons were found at 3:00 a. m., that the policeman acted reasonably in stopping and questioning that man.

■ Once the policeman stopped and questioned the appellant, he had reason to frisk him because he refused to cooperate with the officer's inquiries.

Q. And what was the first thing that you did? Was that to ask him his name?

A. That's correct. I asked him where he was coming from.

Q. What did he tell you about where he was coming from?

A. He didn't say.

Q. You mean he just stood there without answering you?

A. That's correct.

Q. Did you ask him again?

A. Yes, I did.

Q. And what happened then? What was his response?

A. He still didn't answer.

The appellant's unresponsiveness caused the policeman's suspicion to rise to a higher level at which when combined with the information in the radio message that the alleged criminal may be armed provided the officer with grounds to frisk the appellant under the *Terry* doctrine. *Terry v. Ohio*, supra. The Supreme Court stated in *Terry*:

If this case involved police conduct subject to the Warrant Clause of the Fourth Amendment, we would have to ascertain whether "probable cause" existed to justify the search and seizure which took place. However, that is not the case. We do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure, see e. g., *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Beck v. State of Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964); *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), or that in most instances failure to comply with the warrant requirement can only be excused by exigent circumstances, see, e. g., *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (hot pursuit); cf. *Preston v. United States*, 376 U.S. 364, 367–

368, 84 S.Ct. 881, 884, 11 L.Ed.2d 777 (1964). But we deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures. Nonetheless, the notions which underlie both the warrant procedure and the requirement of probable cause remain fully relevant in this context. In order to assess the reasonableness of Officer McFadden's conduct as a general proposition, it is necessary "first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen," for there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." *Camara v. Municipal Court*, 387 U.S. 523, 534–535, 536–537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967). And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? Cf. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Beck v. State of Ohio*, 379 U.S. 89, 96–97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142 (1964).

Id. at 20–22, 88 S.Ct. at 1879–1880, 20 L.Ed.2d at 905–06.

We hold that the officer's actions were a reasonable response to the appellant's actions in light of the policeman's knowledge that the person reported to have committed the offense was armed when viewed also with the knowledge that the appellant refused to answer the policeman's questions.

When the policeman found the gun, he asked the appellant if he had a license to carry it. Sheridan did not respond. The policeman accordingly arrested him based upon the probable cause established by the appellant's illegal possession of a firearm. The policeman then obtained evidence which linked the appellant to the crime when he made a search incident to the arrest. The trial court, accordingly, refused to suppress evidence which the officer properly seized. We affirm the decision of the trial court.

JOHNSON, J., files a dissenting opinion.

JOHNSON, Judge, dissenting:

I must dissent regarding the issue of whether or not there was even reasonable justification[1] to stop Appellant. Although the majority justifies the stop by comparing the facts in the instant case with those in *Lovette*, 271 Pa.Super.Ct. 250, 413 A.2d 390 (1979), the issue of the stop was not even before the court in *Lovette*. *Lovette*, therefore, does not constitute a valid precedent by which the validity of the stop may be determined. Thus, we must direct our attention to cases involving a stop to determine whether or not there was even reasonable justification to stop Appellant.

When a police officer stops an individual and restrains his freedom to walk away, he has seized that person. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968); *Commonwealth v. Hicks*, 434 Pa. 153, 157, 253 A.2d

---

1. The Courts have employed terms like "reasonable justification," "articulable reasons," and "founded suspicion" to designate a standard of justification, which is less than probable cause, to stop a suspect. *See United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

276, 278 (1969). The Fourth Amendment requires that such seizures must be reasonable. *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975).

Although the majority contends that the police were justified in stopping and frisking Appellant as an "intermediate response," even a brief stop must be supported by articulable and objective criteria which indicate that the person seized is, or is about to be, engaged in criminal activity. *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980). The term, "intermediate response," was employed by the Court in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972):

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response.

*Id.* at 145, 92 S.Ct. at 1922. A brief review of *Adams*, as well as other United States Supreme Court, and Pennsylvania, cases, indicates that the policeman was not justified either to stop or to frisk Appellant in the instant case.

Several crucial distinctions must be made between *Adams v. Williams* and the instant case. In *Adams*, the officer acted upon a tip from a trusted informant. In the instant case, the policeman acted upon an unsubstantiated radio message. In *Adams*, the informant personally provided specific information that was "immediately verifiable at the scene." 407 U.S. at 146, 92 S.Ct. at 1923. The informant pointed to a specific vehicle and told the officer exactly where a loaded pistol was located. In the instant case, the radio message—even if reliable—did not identify Appellant but provided a general description of a suspect. Thus the instant case lacks the specificity and reliability that justified

the officer's "intermediate response" in *Adams.* *See Commonwealth v. Anderson,* 481 Pa. 292, 392 A.2d 1298 (1978); *Commonwealth v. Pinney,* 474 Pa. 210, 378 A.2d 293 (1977); *Commonwealth v. Berrios,* 437 Pa. 338, 263 A.2d 342 (1969).

Counsel stipulated that the radio message contained the following information: "2008 Pine Street. Committed by one Negro male with white raincoat, blue watch hat. May be armed with gun. Three minutes ago" (N.T. 12, 10/1/79).[2] Appellant was not even wearing the clothing described in the message. Instead of a white raincoat, Appellant wore a tan winter overcoat. Rather than a blue watch hat, Appellant did not wear a hat. Thus, Appellant's only similarity to the radioed description was that he was a black male who wore a tan—not a white—coat.

The majority seems to concede that there was little evidence to connect Appellant with the crime. Despite this concession, and in light of the many dissimilarities between Appellant's appearance and the radioed description, the majority contends that the stop was "legitimate" because the Commonwealth argued that few people would be in or near the geographical area in which the crime occurred. A mere argument by the Commonwealth does not constitute evidence to justify the stop. *Mosey v. Mosey,* 147 Pa.Super.Ct. 466, 24 A.2d 59, 61 (1942). While the policeman testified that Appellant was the only person on the street at the time the officer stopped him, no testimony was presented to establish either the frequency with which people appeared in the area between certain early morning hours (e. g. 2:00 a. m. to 4:00 a. m.) during a two-week or other designated period of time, or that no one else was in the area during the entire early morning of the day on which the crime occurred.

**2.** The majority includes in the radio message a statement that the suspect's height was 5'8". Although this statement was a finding of fact at the suppression hearing, it was not part of the radio message as stipulated by counsel at that hearing. (N.T. 12, 10/1/79). It is not at all clear how the trial court, and the majority, are able to disregard the stipulated facts since the issue is concerned with the identification that was broadcast in the police message.

Absent such testimony by a competent witness, the Commonwealth's argument concerning the presence of other individuals in the area is certainly not sufficient to "legitimize" the stop. In fact, it totally lacks any evidentiary value.

The Court in *Adams* states that "[a] brief stop of a suspicious individual...may be most reasonable in light of the facts known to the officer at the time." 407 U.S. at 146, 92 S.Ct. at 1923. Recent decisions of the United States Supreme Court have defined some definite boundaries by which a policeman's suspicions must be guided.

In *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), an agent of the Drug Enforcement Administration (DEA) stopped two passengers whose conduct was suspicious in light of a "drug courier profile" prepared by the DEA. The agent considered the following facts to be especially relevant: (1) the suspects had arrived from Fort Lauderdale, which is the principal outlet where cocaine is obtained; (2) the suspects arrived in the early morning, when law enforcement activity is lessened; (3) the suspects tried to conceal the fact that they were traveling together; and (4) they had no luggage other than their shoulder bags. Although the suspects agreed to have their persons and baggage searched, the petitioner dropped his bag and ran as they entered the terminal. The Court held that the cocaine, which was found in the petitioner's bag, must be suppressed because the agent lacked sufficient justification to stop petitioner and his companion.

In *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Court held that the Fourth Amendment precluded the Border Patrol from stopping petitioner's car because the three occupants appeared to be of Mexican descent. The Court explained that, even though stopping and questioning a car's occupants constituted a modest intrusion so that probable cause was not required, under *Terry* and *Adams,* the officer must be able to point to "specific and articulable facts" which warrant a belief that the officer's or others' safety is in danger. 422 U.S. at 880, 95 S.Ct. at 2579.

In the instant case, Appellant was a black man in a light-colored coat—not the coat described in the radio message—who merely walked on a street in the vicinity of the reported burglary. Unlike *Adams*, there was not a reliable informant to point specifically to Appellant as the suspect. We have merely a vague similarity between Appellant's appearance and the radioed description, coupled with the fact that Appellant's conduct in no way would have justified any rational belief that Appellant was engaged in criminal activity.

If the instant case is compared with the United States Supreme Court decisions discussed above, the vague similarity between Appellant's appearance and the radio message constitutes no more reasonable justification to stop Appellant than the petitioner's Mexican descent in *Brignoni-Ponce* or the similarity to the drug courier profile in *Reid*. Because Appellant was the only black male on the street at the time when the officer saw him, there was no testimony to indicate either that another black male may not have appeared a few minutes later or that it was unusual for a black male to appear in that area during the early morning. Absent such facts, and considering that Appellant's behavior gave no indication that crime was afoot, there was no reasonable justification to stop Appellant.

*Commonwealth v. Berrios*, 437 Pa. 338, 263 A.2d 342 (1970), is on point with the instant case. Two black youths in dark clothing and one Puerto Rican in light clothing were believed to have been involved in a shooting. The defendant, a Puerto Rican in light clothing, and his companion, a black youth in dark clothing, walked in a normal manner near the scene of the crime approximately twenty minutes after the crime occurred. *Id.*, 437 Pa. at 342, 263 A.2d at 344. The police had no reason to associate the defendant and his companion with the crime except their racial characteristics, the color of their clothing, and their proximity to the site of the crime. The court held that, under the *Terry* criteria, the police did not have reasonable justification to stop and search the defendant. *Id.*, 437 Pa. at 342, 263 A.2d

at 344. *Berrios* cannot be reconciled with the majority's opinion in the instant case.

In *Commonwealth v. Anderson*, 481 Pa. 292, 392 A.2d 1298 (1978), the Supreme Court of Pennsylvania again held that the police did not have reasonable justification under *Adams* and *Terry* to stop a person because his appearance corresponded with a general description transmitted by a police radio message. A black male, named "Perry," who was 5'10" with a large bush hair style and a dark coat, was in a particular bar. The court distinguished between the general description, transmitted by radio, and *Adams* in which the informant was known to the officer, the informant pointed to a specific individual, and the information could be verified immediately. Like *Anderson*, the instant case lacks these aspects of specificity and reliability.

Without either the specificity and reliability involved in *Adams* or the officer's personal observations—based upon articulable facts rather than mere suspicion—involved in *Terry v. Ohio*, reasonable justification to stop a suspect does not exist. *See Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Commonwealth v. Anderson*, 481 Pa. 292, 392 A.2d 1298 (1978); *Commonwealth v. Pegram*, 450 Pa. 590, 301 A.2d 695 (1973); *Commonwealth v. Berrios*, 437 Pa. 338, 263 A.2d 342 (1970); *Commonwealth v. Hicks*, 434 Pa. 153, 253 A.2d 276 (1969); *Commonwealth v. Williams*, 291 Pa.Super.Ct. 621, 435 A.2d 248 (1981); *Commonwealth v. Mears*, 283 Pa.Super.Ct. 416, 424 A.2d 533 (1981); *Commonwealth v. Cruse*, 236 Pa.Super.Ct. 85, 344 A.2d 532 (1975).

The instant case lacks both the specificity and reliability of *Adams* and the observations of conduct that would lead the officer to believe that criminal activity was afoot as in *Terry*.

Although the majority cites *Commonwealth v. Kazior*, 269 Pa.Super.Ct. 518, 410 A.2d 822 (1980), *Kazior* included a degree of specificity, coupled with the officer's personal

observations, that is lacking in the instant case. In *Kazior*, the officer received a radio message that a burglary had occurred at a nearby store. When the officer approached the store, he saw two men—one in a green jacket—running from the store. As the policeman proceeded in the direction where the men had run, a resident directed him to a parked vehicle, where a search revealed the suspects were hiding. Thus the officer personally observed two specific individuals who ran from the scene of the crime. When the officer lost sight of the individuals who ran in a certain direction, a resident, who had observed the suspects, pointed to a specific vehicle. Unlike the generalities in the instant case, *Kazior* involves the specificity of *Adams*.

The majority relies most heavily upon *Commonwealth v. Lovette*, 271 Pa.Super.Ct. 250, 413 A.2d 390 (1979). Judge SPAETH, in his comprehensive dissent, notes the conflict between the decision in *Lovette* and that of the United States Supreme Court in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). As noted above, *Lovette* did not discuss the validity of the stop or the frisk, which is the issue raised in the instant case. If reasonable justification for the stop did not exist, the "fruits" of the unlawful stop must be suppressed. *Commonwealth v. Boyer*, 236 Pa.Super.Ct. 214, 345 A.2d 187, 190 (1975) (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 [1963]).

The majority attempts to justify the frisk on the grounds that Appellant did not answer the officer's questions. In *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), an officer observed the defendant and another man walking in opposite directions in an alley frequented by drug users. Under a Texas statute, the defendant was fined for refusing to identify himself when the officer stopped him. The United States Supreme Court reversed because the stop was not based upon objective criteria.

In the instant case, the policeman did not have reasonable suspicion to stop Appellant. Thus, adopting the rationale of *Brown v. Texas*, Appellant had no duty to identify himself. The refusal to talk with a policeman does not constitute

cause to frisk the suspect. In *Commonwealth v. Jeffries*, 454 Pa. 320, 311 A.2d 914 (1973), the suspect ran when he saw the policeman. The court, on review, quoted *United States v. Margeson*, 259 F.Supp. 256 (E.D.Pa.1966):

[F]light, in and of itself, is not sufficient to constitute probable cause for otherwise anyone, who does not desire to talk to the police and who either walks or runs away would always be subject to a legal arrest.

454 Pa. at 324, 311 A.2d at 917. If flight does not constitute cause to stop a suspect, a suspect's silence does not constitute cause to frisk him.

In light of the cases discussed above, I can only conclude that the officer lacked reasonable justification to stop or to frisk Appellant. Because both the stop and the frisk were illegal, the evidence thereby obtained should be suppressed. *Commonwealth v. Boyer*, 236 Pa.Super.Ct. 214, 219, 345 A.2d 187, 190 (1976). Since the complainant could not identify Appellant, the evidence to be suppressed constituted the entirety of the Commonwealth's case. Thus, a new trial would serve no purpose. *Id.*, 236 Pa.Super. at 219, 345 A.2d at 190. I would, with reluctance, reverse the order of the lower court denying the Motion in Arrest of Judgment, and discharge Appellant.