J-S02037-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| HANEEF A. MELTON | : | No. 517 EDA 2024 |

Appeal from the Order Entered February 2, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002878-2023

BEFORE:  LAZARUS, P.J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED MAY 6, 2025**

The Commonwealth appeals from the order granting Haneef A. Melton's motion to suppress. We conclude the record does not support the trial court's factual findings and it erred in granting the motion. We therefore reverse.

In January 2023, Melton was arrested. In January 2024, he filed a motion to suppress arguing the police illegally seized him and seeking suppression of evidence and statements obtained as a result of the seizure.

Pennsylvania State Trooper Anthony Mooney testified at a hearing on the motion to suppress that on January 23, 2023, he was on patrol alone and received a radio call for a shooting incident on Faunce Street. N.T., Feb. 2, 2024, at 8, 11. He stated that he received "flash information" over police radio for a six-foot black or Hispanic male wearing all black with a "distinctive nose piercing"—"a barbell at the top of his nose." *Id.* at 8-9. Officer Mooney further testified that the "flash information was [] from the police officers who were

at Faunce Street." *Id.* at 20-21. A subsequent flash information advised that the suspect had gone south on Roosevelt Boulevard. *Id.* at 9. A third flash information relayed that the suspect's name was "Haneef Milton." *Id.* at 10. Officer Mooney stated that after receiving this information, he started to survey the Roosevelt Boulevard area and saw Melton "walk[]out from behind" the dumpsters on the side of a mall and "walk[] towards the middle of the parking lot." *Id.* at 9. He was less than a mile from the location of the shooting. *Id.* at 10.

Officer Mooney testified that the dumpsters were "kind of dark," but when Melton walked toward the middle of the parking lot, "it was well lit." *Id.* at 11. The Commonwealth asked Officer Mooney, "[W]ere you able to make out anything distinct about this defendant[']s face when you saw him in the parking lot?" *Id.* He responded, "Yes, [I] could see the barbell piercing on his nose." *Id.* Officer Mooney testified that he pulled his vehicle forward and as he looked through the window, he "believe[d he] asked [Melton] his name," and Melton's response matched the name from the flash report. Officer Mooney "told him to get on the ground," and Melton complied. *Id.* at 11-12. After back-up officers arrived, the police recovered from Melton three handguns. *Id.*

On cross-examination, Officer Mooney testified that Melton wore black jeans, a Rick and Morty black hoodie with green on the front, and red and white Crocs. *Id.* at 16-17. He further testified that he saw the nose piercing as soon as he saw Melton's face:

Q. As you are giving your commands to get on the ground, show me your hands, he's doing all of the things you are telling him to do?

A. Yes.

Q. During your interaction with him, Officer Mooney, that is when you see the bar on the bridge of the nose?

A. No, that is from inside the vehicle. I'm looking directly in his face when he is standing outside of my car.

Q. Yes, I understood that. I understood that. All of your initial interactions of course are from the car, from the driver[']s seat?

A. Correct.

Q. To this gentleman standing outside.

A. Correct.

Q. When you asked him, when you gave the command show me your hands, you hadn't yet seen this bar across the nose.

A. As soon as I looked at his face you could see it.

Q. As soon as you looked in his face.

When you pulled up next to him the first thing you said was what? And I don't mean like a direct quote but something to the effect of what?

A. Honestly, the wording I couldn't tell you. When I pulled up I kind of told him let me see your hands. I could see his face. I said hey, what's your name. He told me his name. I told him to get on the ground. That is when he complies and he's on the ground.

*Id.* at 18-19.

The trial court granted the motion to suppress. It concluded that the seizure occurred without reasonable suspicion and the search occurred without probable cause:

I'm going to grant the motion to suppress.

I find the following and I'm basing this on the officer['']s testimony. He tells me that he pulled up and says let me see your hands and while that was happening he could see Mr. Melton's face.

The caselaw that let me see your hands or directing someone to remove their hands is a seizure which requires reasonable suspicion. That happens here at the same time as the nose piercing is seen.

So, I think that the officer didn't have reasonable suspicion at that point.

I'm also basing it on the fact that while I understand that there is a description in the case I do think that counsel is right, the description here is other th[a]n a nose piercing relatively vague. It's a six foot tall man who is either black or Hispanic. He's wearing all black and has this nose piercing.

In this case Mr. Melton isn't wearing all black. So, he doesn't match that part of the description. I don't know how tall he is because that's not in the record.

I'm just suppressing the . . . the guns, plural.

So, I have a problem in that he doesn't exactly match the description and the part that is kind of the most detailed is observed at the same time the officer is directing this person to put their hands up.

I think this is distinguishable from [**Commonwealth v. Chase**, 575 A.2d 574 (Pa.Super. 1990)] because one of the things about **Chase** is that there you have a police officer providing information. And so we have a named person. In this case the Commonwealth may have had this evidence but you didn't put it on. I don't have a source as to how reliable this flash is or not.

So, to a certain extent it is very similar [to] an anonymous flash because I don't know if it's the complainant, I don't know if it's another person. And I think we all know that the reason we just don't rely on anonymous or unreliable flashes is because I could then call the police

and say hi, you know Mr. Johnson, this guy wearing this blue suit and red tie is carrying a weapon in the courthouse.

That's why I'm finding there isn't reasonable suspicion here. And obviously if there isn't reasonable suspicion, once he orders him to lie on the ground that's clearly more th[a]n just an investigatory stop.

And I don't find that the name is enough. I mean I have a reliability problem here. I don't have enough information about the flash particularly since there isn't anything more here. I just have a guy walking in a parking lot in a mall.

I don't have any evidence as to how many people we're at the mall but it's a mall. So, there's going to be kind of common sense says a decent number of people. And I have less th[a]n a mile but I don't have half a mile, I don't have five blocks. I have the Roosevelt Boulevard which I think we can all agree is a place where there is a lot of traffic and there's a lot of things at the Roosevelt Boulevard.

So, I don't think there's enough there for there to have been reasonable suspicion. If the officer had stopped him and asked him for his name and then got some more information or asked him to wait to see if the complainant would come and identify him I think you would be in a better position.

But, they put him on the ground and started searching him and I think frankly at that point that's not a protective sweep, it's not a stop and a frisk. It's a full-blown search and I think you need probable cause for that. I don't think you have it.

*Id.* at 32-35.

The Commonwealth appealed, and raises the following issue:

Did the lower court err by ordering suppression where a police officer responding to a radio call for a shooting stopped [Melton] because his distinctive nose piercing, height, race, gender, clothing, location, and name matched that provided in the flash information of the suspect, the officer encountered [Melton] lurking behind dumpsters outside of a shopping mall, and [Melton] was found less than a mile from and within a half-hour of the reported shooting?

- 5 -

Cmwlth. Br. at 4.

The Commonwealth argues that the brief, investigatory detention was supported by reasonable suspicion. It contends that numerous factors established reasonable suspicion: Melton's appearance matched the description provided by the flash information, including the distinctive nose piercing and his height, race, gender, and clothing; Melton's name matched the name provided in the flash information; and the stop was close in time and location to the crime scene. The Commonwealth maintains that the flash information was sufficiently specific to authorize Officer Mooney to investigate. It further maintains additional circumstances corroborated reasonable suspicion, including that Milton was "lingering behind dumpsters outside of a shopping mall at 9:45 p.m. on a Tuesday evening in January." *Id.* at 14. The Commonwealth points out Melton was stopped less than one mile from and within a half hour of the shooting, and was found south of the crime scene, along Roosevelt Boulevard, which was the direction the flash information indicated the suspect had fled.

The Commonwealth maintains there is no requirement that the stopped individual exactly or fully match the suspect's description, and courts have upheld stops where discrepancies exist. It notes that courts apply a totality of the circumstances test and argues that the trial court "ignored [the] totality of the circumstances because [Melton's] shoes and clothing bore additional characteristics that were neither mentioned—nor contradicted—by the reported description." *Id.* at 17 (emphasis omitted). The Commonwealth

points out that the flash description did not mention the suspect's shoes and maintains that it was not surprising that the flash description included the garments' primary color and but not additional details.

The Commonwealth further argues the trial court erred in finding the tip was anonymous. It argues Melton did not argue this below but rather had conceded it was not anonymous, thus depriving the Commonwealth of notice that it needed to prove the source of the information. It notes that Melton's motion to suppress acknowledged that the officers giving the flash information relied on a tip from the alleged victims and stresses that during argument Melton's counsel stated the tip was not anonymous.

The Commonwealth argues that, regardless, the record rebuts the finding of anonymity. It maintains police officers may rely upon information from third parties, including non-police sources. It emphasizes Officer Mooney's testimony that he received the suspect's description from flash reports and that the flash "was coming from the police officers who were at [the location of the shooting]." *Id.* at 20 (citation omitted). It further points out that there was an initial radio call, followed by two subsequent flash reports with additional details, which, it argues, suggests the source was not anonymous.

The Commonwealth also maintains the testimony established Officer Mooney saw the barbell nose ring before stopping Melton, as he saw Melton walking from the dumpster area to the parking lot, which was a well-lit area, and could see his face. It also maintains that even if he saw the nose piercing

after asking Melton to show his hands, the encounter still was a mere encounter, not a seizure. It maintains whether a request that a person show their hands is a mere encounter or a seizure is a fact-specific inquiry.

When reviewing an order granting a motion to suppress, "[w]e consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted." *Commonwealth v. Arthur*, 62 A.3d 424, 427 (Pa.Super. 2013). This Court first "determine[s] whether the record supports the factual findings of the suppression court and then determine[s] the reasonableness of the inferences and legal conclusions drawn from those findings." *Id.*

"[A] police officer may rely upon information which is broadcast over a police radio in order to justify an investigatory stop." *Commonwealth v. Jackson*, 519 A.2d 427, 430 (Pa.Super. 1986) (quoting *Commonwealth v. Prengle*, 437 A.2d 992, 994 (Pa.Super. 1981)). The factors that court must consider when determining whether "an investigatory stop and subsequent frisk" are justified "include the specificity of the description of the suspect in conjunction with how well the suspect fits the given description, the proximity of the crime to the sighting of the suspect, the time and place of the confrontation, and the nature of the offense reported to have been committed." *Id.*

As outlined above, in granting the motion to suppress, the trial court relied on several findings. It maintained the flash information came from an anonymous source; Melton's clothing did not match the flash description

because he was wearing red and white crocs and had a green emblem on his black hoodie, neither of which was in the flash report; and Officer Mooney did not see the barbell nose ring until after he initiated the stop by informing Melton to raise his hands.

First, we agree with the Commonwealth that Melton did not claim below that the tip was anonymous, and in fact conceded that it was not. In his motion to suppress, Melton stated that before the arrest, "officers relied on a tip from the alleged victims" describing the suspect. Motion to Suppress, filed Jan. 3, 2024, at ¶ 22. At the hearing, he explicitly stated that the tip was not anonymous:

> [M]uch like what I put in my motion, it is kind of akin to [*Commonwealth v. Jackson*, 698 A.2d 571 (Pa. 1997), *Commonwealth v. Hawkins*, 692 A.2d 1068 (Pa. 1997), *Commonwealth v. Kue*, 692 A.2d 1076 (Pa. 1997),] which is the trilogy of cases that talks about -- let me be clear about those.
>
> Those cases talk about anonymous tips and **this was not in fact anonymous. This is a known doer.** However, those cases do provide us guidance in terms of descriptions and when an officer and who an officer should be able to stop when they are surveying an area for a potential suspect.

N.T., Feb. 2, 2024, at 24 (emphasis added).

Accordingly, Melton waived this claim. *Commonwealth v. Banks*, 165 A.3d 976, 980-81 (Pa.Super. 2017) (concluding defendant waived challenge to illegal detention when he did not include it in his motion to suppress or amend the motion to include the issue); *Commonwealth v. Whiting*, 767 A.2d 1083, 1087-88 (Pa.Super. 2001) (concluding defendant waived search

of car because he did not include it in motion to suppress, noting court never took testimony on the issue and therefore could not make an informed decision and Commonwealth was not able to fulfill burden of presenting evidence); *see also* Pa.R.Crim.P. 581(D) ("The motion [to suppress] shall state specifically and with particularity the evidence sought to be suppressed, the grounds for suppression, and the facts and events in support thereof").

Even if he had not waived the claim, the record does not support a finding that the source was anonymous. The cases the trial court relied on involved phone tips from unknown sources reporting potential crimes.[1] Here, police officers were relaying flash information from the scene of a crime, and they provided detailed information in a series of reports. Officer Mooney permissibly relied on the flash information. *See Jackson*, 519 A.2d at 430 & 440 n.3 ("A flash information is based on a report from the initial officers to investigate the scene of a crime and is broadcast to other police units in the district.").

Nor does the record support the trial court's finding that the first time Officer Mooney saw the barbell nose ring was when he told Melton to raise his hands. Rather, his uncontradicted testimony was that he saw the ring prior to the instruction. Officer Mooney testified that when he saw Melton in the

---

[1] *See, e.g., Commonwealth v. Wiley*, 858 A.2d 1191, 1196-97 (Pa.Super. 2004) (finding source anonymous where when he called the police he described a person, stated the person's location, and asserted the person had a gun and where the source did not provide his name, address, or other identifying information until after police apprehended the defendant).

parking lot, he "could see the barbell piercing on his nose." N.T., Feb. 2, 2024, at 11. On cross-examination, Officer Mooney confirmed that he saw the barbell as soon as he saw Melton's face:

> Q. As you are giving your commands to get on the ground, show me your hands, he's doing all of the things you are telling him to do?
>
> A. Yes.
>
> Q. During your interaction with him, Officer Mooney, that is when you see the bar on the bridge of the nose?
>
> A. No, that is from inside the vehicle. I'm looking directly in his face when he is standing outside of my car.
>
> Q. Yes, I understood that. I understood that. All of your initial interactions of course are from the car, from the driver[']s seat?
>
> A. Correct.
>
> Q. To this gentleman standing outside.
>
> A. Correct.
>
> Q. When you asked him, when you gave the command show me your hands, you hadn't yet seen this bar across the nose.
>
> A. As soon as I looked at his face you could see it.
>
> Q. As soon as you looked in his face.
>
> When you pulled up next to him the first thing you said was what? And I don't mean like a direct quote but something to the effect of what?
>
> A. Honestly, the wording I couldn't tell you. When I pulled up I kind of told him let me see your hands. I could see his face. I said hey, what's your name. He told me his name. I told him to get on the ground. That is when he complies and he's on the ground.

*Id.* at 18-19.

- 11 -

When read in its entirety, Officer Mooney's testimony does not support the trial court's finding. Officer Mooney testified on direct that he saw the piercing when he saw Melton in the parking lot, and the exchange on cross-examination demonstrates that he saw it before asking Melton to show his hands. The trial court relied on Officer Mooney's response to a question about what he said to Melton when he pulled his vehicle forward. Officer Mooney stated, "I kind of told him let me see your hands. I could see his face." This one statement, in context, does not establish that the first time Officer Mooney saw Melton's face was when he told him to raise his hands. Rather, Officer Mooney merely said that he could see Melton's face when he told Melton to raise his hands. He did not state it was the first time he saw Melton's face.

We further find the trial court erred in finding Officer Mooney did not have reasonable suspicion to stop Melton. Melton matched the description provided by the flash report – a black or Hispanic man, wearing black clothing, with a nose barbell ring. Although his shoes were red and white, and his black sweatshirt had some green on it, he had a mostly black sweatshirt and black jeans, and therefore was dressed in black. The suspect need not exactly match the description provided for an officer to have reasonable suspicion for a stop. *Jackson*, 519 A.2d at 430 (how well suspect fits description is one factor in totality of circumstances test); *Commonwealth v. Robinson*, 2019 WL 3249403, at *2-4 (Pa.Super. filed July 19, 2019) (unpublished mem.) (finding police had reasonable suspicion to stop defendant, noting clothing did not match, but police suspected defendant changed clothing); *Commonwealth*

*v. Sheridan*, 437 A.2d 44, 46 (Pa.Super. 1981) (lawful stop even though defendant was wearing an overcoat and not a raincoat as described, coat was a different color than the one described, and defendant was not wearing a hat as described where stop was three blocks from scene of crime at 3:00 a.m.). Further, Officer Mooney located Melton within a half hour of the shooting in the direction that the flash report had stated the suspect had fled and within one mile of the crime scene, and he first observed Melton near the dumpsters outside a shopping mall at 9:45 p.m. on a Tuesday in January. When viewed in the totality of the circumstances, Officer Mooney had reasonable suspicion supporting a stop of Melton. Further, as we stated, the source was not anonymous. Therefore, when Melton provided his name, and the name matched that in the flash report, there was reasonable suspicion to search Melton.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/6/2025

- 13 -