457 A.2d 877

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Donna M. LAPIA, a/k/a Jan Marks.**

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Billy G. DUGGER.**

Superior Court of Pennsylvania.

Argued June 24, 1982.

Filed Feb. 4, 1983.

Reargument Denied April 12, 1983.

Robert L. Eberhardt, Deputy District Attorney, Pittsburgh for Commonwealth, appellant (at No. 1043).

Lee Ruslander, Assistant District Attorney, West Chester, for Commonwealth, appellant (at No. 2696).

Norma Chase, Pittsburgh, for Lapia, appellee (at No. 1043).

Andrew Stuart Wade, West Chester, for Dugger, appellee (at No. 2696).

Before CERCONE, President Judge, and SPAETH, CAVANAUGH, WIEAND, McEWEN, CIRILLO and MONTEMURO, JJ.

SPAETH, Judge:

This case arises on two appeals, each by the Commonwealth from an order suppressing evidence. We ordered the appeals consolidated because they both involve the issue of when an order suppressing evidence is appealable.

■ In Part I of this opinion we conclude that an order suppressing evidence is appealable when it is apparent from the record that the order terminates or substantially handicaps the prosecution. This conclusion involves overruling *Commonwealth v. Martz*, 259 Pa.Superior Ct. 201, 393 A.2d 787 (1978), and *Commonwealth v. Kunkel*, 254 Pa.Superior Ct. 5, 385 A.2d 496 (1978) (plurality opinion), where we held that an order suppressing evidence is not appealable if the Commonwealth fails to state in its brief that the order terminates or substantially handicaps the prosecution, with a brief explanation, which may go outside of but must not be inconsistent with the record, of why that is so. It also involves overruling *Commonwealth v. Trefry*, 249 Pa.Superior Ct. 117, 375 A.2d 786 (1977), and *Commonwealth v. Deren*, 233 Pa.Superior Ct. 373, 337 A.2d 600 (1975), where we held that "we must accept" an appeal from an order suppressing evidence "as the Commonwealth's good faith certification" that the prosecution will be terminated or substantially handicapped.[1]

■ In the course of our discussion we recognize that sometimes an order suppressing evidence may in fact substantially handicap the prosecution but that fact will not be apparent from the record. We have concluded, however, that in such a case the order suppressing evidence is not appealable, and cannot be made appealable by any statement by the Commonwealth. If such an order is to be appealable, it must be made appealable by Supreme Court

---

1. It might appear from the way in which we have just described them that *Deren* and *Trefry* would have already been overruled by *Kunkel* and *Martz*. However, in *Kunkel* we said that "with a little pushing and pulling," *Deren* and *Trefry* could be understood as not inconsistent with the position being announced in *Kunkel*, and neither *Kunkel* nor *Martz* purported to overrule them.

rule. Judge CAVANAUGH, in an opinion joined by Judge MONTEMURO, concurs in this conclusion. Judge McEWEN and Judge CIRILLO, for the reasons stated in their respective opinions, would not overrule *Trefry* and *Deren.*

In Part II of this opinion we apply to the two orders before us the conclusions reached in Part I, and find that it is apparent from the record that both orders would terminate the prosecution. We therefore hold the orders appealable, and consider them on their merits. Again we are variously divided. In *Commonwealth v. Lapia,* we all agree that the evidence was properly suppressed and that the order of the lower court should therefore be affirmed. The reasoning of the majority of the court is stated in this opinion. Judge WIEAND and Judge CIRILLO concur in the result. In *Commonwealth v. Dugger,* we are obliged to interpret the Act of May 11, 1911, P.L. 274 § 4, 61 P.S. § 384. In this opinion the view is expressed, first, that under the Act, prison officials may, in a manner appropriate to the particular circumstances, search a person who wishes to visit the prison, if the officials act on the basis of reasonable suspicion, and if the visitor, after being advised that he may leave without making his visit, voluntarily consents to the search; and second, that on the record here, the Commonwealth failed to prove either reasonable suspicion or voluntary consent. The President Judge joins in this opinion. Concurring, Judge CAVANAUGH, in an opinion joined by Judge MONTEMURO, would hold that the Commonwealth did prove reasonable suspicion, but that where, as here, the search was a strip search, voluntary consent to the search must also be proved and that it was not. Thus, the President Judge, Judge CAVANAUGH and Judge MONTEMURO, and I agree that the search was illegal and, therefore, that the evidence was properly suppressed and the order of the lower court should be affirmed. Judge WIEAND, in an opinion joined by Judge McEWEN and Judge CIRILLO, would hold that the Commonwealth did prove reasonable suspicion and consent.

They would therefore uphold the search and reverse the order of the lower court.

## I

In *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304, *cert. denied*, 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963), the Supreme Court held that when an order suppressing evidence terminates or substantially handicaps the prosecution, the order is immediately appealable by the Commonwealth. This is so because in practical effect, the order is final. If the Commonwealth were required to go to trial without the suppressed evidence, the defendant would probably, if not certainly, be acquitted. Since the Commonwealth may not appeal an acquittal, it would never have had an opportunity to secure appellate review of the order.

In *Bosurgi* the court did not address the question of how an appellate court is to determine whether an order suppressing evidence does in fact terminate or substantially handicap the prosecution. In *Commonwealth v. Martz*, 259 Pa.Superior Ct. 201, 393 A.2d 787 (1978), this court specified a procedure that it hoped would enable it to make that determination, and thereby decide whether an order is appealable. The procedure had been proposed by the plurality opinion in *Commonwealth v. Kunkel*, 254 Pa.Superior Ct. 5, 385 A.2d 496 (1978). It was that an order suppressing evidence is not appealable if the Commonwealth fails to state in its brief that the order terminates or substantially handicaps the prosecution, with a brief explanation, which may go outside of but must not be inconsistent with the record, of why that is so.

It is undisputed that in the two cases before us, the Commonwealth failed to comply with the procedure established by *Kunkel* and *Martz*. In the first case, *Commonwealth v. Lapia*, No. 1043 April Term 1978, a panel of this court filed an opinion and order on March 12, 1982, quashing the Commonwealth's appeal because of that failure. We granted the Commonwealth's petition for reargument before the court *en banc*. We also *sua sponte* ordered

reargument in the second case, *Commonwealth v. Dugger,* No. 2696 Philadelphia 1980, which had been argued before another panel but had not yet been decided. We then ordered the cases to be reargued together and instructed counsel that we wished to reconsider the procedures established by *Kunkel* and *Martz.*

## A

We may start our discussion by reviewing the decisions that led to *Kunkel* and *Martz.*

This court's first citation of *Bosurgi* in connection with a Commonwealth appeal from an order suppressing evidence was in *Commonwealth v. Smyser,* 205 Pa.Superior Ct. 599, 211 A.2d 59 (1965). There we said simply, "Such an appeal is properly made at this time: *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304." *Id.,* 205 Pa.Superior at 601, 211 A.2d at 61. Our next case was *Commonwealth v. Rose,* 211 Pa.Superior Ct. 295, 235 A.2d 462 (1967). There we said: "The Commonwealth has appealed. Since appellee has not filed a motion to quash, we will assume that the suppression order will substantially handicap the Commonwealth and hear the appeal." *Id.,* 211 Pa.Superior at 296, 235 A.2d at 463. The next year we decided *Commonwealth v. Smith,* 212 Pa.Superior Ct. 403, 244 A.2d 787 (1968). There, without reference to whether a motion to quash had or had not been filed, we quashed the appeal because we determined from the record that despite the suppression order, the Commonwealth still had enough evidence so as not to be substantially handicapped.

In these cases, as well as in others, *e.g., Commonwealth v. Payton,* 212 Pa.Superior Ct. 254, 243 A.2d 202 (1968); *Commonwealth v. Hernley,* 216 Pa.Superior Ct. 177, 263 A.2d 904 (1970), *cert. denied,* 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971), there was no indication of any disagreement, either about the propriety of the appeals, or about how that propriety was to be determined.

This harmony did not continue. In *Commonwealth v. Thorne,* 223 Pa.Superior Ct. 122, 299 A.2d 370 (1972), four

judges held that an appeal should be quashed because the Commonwealth had admitted at oral argument that it was not substantially handicapped by the suppression order, and that admission was supported by the record. The three dissenting judges refused to rely on a memory of what had been said at oral argument; in their opinion, in the absence of a motion to quash, a Commonwealth appeal should be heard unless the record affirmatively showed the availability to the Commonwealth of other evidence. The division within the court became more sharply stated in *Commonwealth v. Deren*, 233 Pa.Superior Ct. 373, 337 A.2d 600 (1975). There four judges said, "[W]hen the District Attorney from one of the counties of this Commonwealth directs an appeal from the suppression of evidence, we must accept such an appeal as the Commonwealth's good faith certification that the case will be terminated or substantially prejudiced by such an order, and [we should] determine only if the suppression was proper." *Id.*, 233 Pa.Superior at 376–377, 337 A.2d at 602. The two dissenting judges refused to accept this formulation and, applying the approach first taken in *Commonwealth v. Smith, supra; see also Commonwealth v. Kloch*, 230 Pa.Superior Ct. 563, 327 A.2d 375 (1974), said that they would find from the record that the Commonwealth was not substantially handicapped because enough other evidence was still available to it, and would therefore quash the appeal.

In *Commonwealth v. DeFelice*, 248 Pa.Superior Ct. 516, 375 A.2d 360 (1977), the opinions were essentially as they had been in *Commonwealth v. Deren*, only what had been the dissent in *Deren* became the majority in *DeFelice*, and the appeal was quashed. However, in *Commonwealth v. Trefry*, 249 Pa.Superior Ct. 117, 375 A.2d 786 (1977), which was filed the same day as *DeFelice*, the majority again took the position of the majority in *Deren*.

The procedure established by *Kunkel* and *Martz* represented an attempt to achieve a compromise of these conflicting opinions. On the one hand, it seemed wrong to say that we *must* take jurisdiction and hear an appeal simply be-

cause the party appellant had filed the appeal. On the other hand, it seemed right to presume that when the Commonwealth did appeal, it appealed believing in good faith that the order suppressing evidence terminated or substantially handicapped the prosecution. Besides, how could we tell whether the Commonwealth was appealing in good faith? Wasn't the judgment that a suppression order substantially handicapped the prosecution a subjective one, which would differ from one district attorney to another? The reasoning behind the *Kunkel—Martz* compromise was that by requiring the Commonwealth to explain, briefly, why the order was appealable, we could if not eliminate at least diminish the chance that an appeal reflected an unduly subjective, or unreasonable, judgment.

Plainly, however, the compromise was an uneasy one. For what, really, was the difference between accepting an appeal without questioning its propriety, as in *Deren* and *Trefry*, and accepting an appeal without questioning its propriety, *so long as* the Commonwealth stated in its brief that the appeal was proper? Also, our application of the compromise was inconsistent. If the Commonwealth made the required statement, we accepted the appeal and considered the suppression order on its merits. *See, e.g., Commonwealth v. Burton,* 292 Pa.Superior Ct. 73, 436 A.2d 1010 (1981). But if the Commonwealth failed to make the required statement, sometimes we quashed the appeal, *e.g., Commonwealth v. Montgomery,* 292 Pa.Superior Ct. 32, 436 A.2d 705 (1981), while other times we permitted the Commonwealth to make a belated statement, *e.g., Commonwealth v. Marzel,* 291 Pa.Superior Ct. 553, 436 A.2d 639 (1981).

## B

After reflecting upon our thrashing about, and re-examining the law, we have reached three conclusions.

Our first conclusion is that *Commonwealth v. Trefry, supra,* and *Commonwealth v. Deren, supra,* must be overruled, if, indeed, they have not already been overruled *sub*

*silentio. Commonwealth v. Hill,* 497 Pa. 230, 439 A.2d 1153 (1982). There, the Supreme Court quashed the Commonwealth's appeal from an order suppressing evidence. Said the Court, *per curiam:* "The appeal of the Commonwealth ... is quashed, as we do not believe the order suppressing the weapon impairs the Commonwealth's case. *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963)." *Id.,* 497 Pa. at 230, 439 A.2d at 1153. This statement makes plain that, contrary to *Trefry* and *Deren,* we are not required to accept an appeal without questioning its propriety. Instead, as an appellate court, we must do what the Supreme Court did: examine the record and decide for ourselves whether the suppression order terminates or substantially handicaps the prosecution. This conclusion, it may be noted, is consistent with, indeed, is required by, the principle that "[t]he finality [*i.e.,* appealability] of an order is a *judicial* conclusion which can be reached only after an examination of its ramifications." *Bell v. Beneficial Consumer Discount Company,* 465 Pa. 225, 228, 348 A.2d 734, 735 (1975) (emphasis added). *See, also, Pugar v. Greco,* 483 Pa. 68, 394 A.2d 542 (1978); *T.C.R. Realty, Inc. v. Cox,* 472 Pa. 331, 372 A.2d 721 (1977); *Toll v. Toll,* 293 Pa.Superior Ct. 549, 439 A.2d 712 (1981); *Gordon v. Gordon,* 293 Pa.Superior Ct. 491, 439 A.2d 683 (1981).

Our second conclusion is that *Commonwealth v. Martz, supra,* and *Commonwealth v. Kunkel, supra,* must also be overruled. The judgment underlying these cases—that it was wrong to say that we must hear an appeal simply because the party appellant in filing the appeal was presumably acting in good faith—has been vindicated. *Commonwealth v. Hill, supra.* However, this judgment is not implemented by requiring the Commonwealth to explain in its brief why the appeal is proper. If the explanation does no more than state facts apparent from the record, it is superfluous; we can examine the record ourselves. If the explanation goes beyond the record, then, by accepting the explanation we are abdicating our responsibility as an appellate court; instead of deciding for ourselves whether we

have jurisdiction, whether, that is, the order is appealable, we are accepting an interested litigant's unsupported assertion.

Our third conclusion is only a different way of stating our first two. It is as follows: When confronted with a Commonwealth appeal from an order suppressing evidence, we must determine for ourselves whether the order is appealable—whether it terminates or substantially handicaps the prosecution; and we must make that determination on the basis of the record, and on that basis alone. This conclusion is consistent with, and derives from, settled principles. With respect to the first part—that we must determine for ourselves whether the order is appealable—we have already cited authority that "[t]he finality of an order is a judicial conclusion." *Bell v. Beneficial Consumer Discount Company, supra; Pugar v. Greco, supra; T.C.R. Realty, Inc. v. Cox, supra; Toll v. Toll, supra; Gordon v. Gordon, supra.* With respect to the second part—that we must make that determination on the basis of the record alone— we have repeatedly held that in deciding a case, we will not consider any statement not supported by facts of record. *General Accident Fire & Life Assurance Corp., Ltd. v. Flamini*, 299 Pa.Superior Ct. 312, 445 A.2d 770 (1982); *Anmuth v. Chagan*, 295 Pa.Superior Ct. 32, 440 A.2d 1208 (1982); *Commonwealth v. Rini*, 285 Pa.Superior Ct. 475, 427 A.2d 1385 (1981).

In addition, our third conclusion is consistent with the Supreme Court's practice. As we have already noted, the Court, in deciding *Bosurgi*, did not address the question of how an appellate court is to determine whether an order suppressing evidence terminates or substantially handicaps the prosecution. However, in practice the Court has always made that determination on the basis of the record, and on that basis alone. That is what it did in *Bosurgi*. In *Commonwealth v. McDade*, 462 Pa. 414, 416 n. 1, 341 A.2d 450, 451 n. 1 (1975) *cert. denied*, 424 U.S. 909, 96 S.Ct. 1102, 47 L.Ed.2d 312 (1976), the Court specifically referred to the record ("clear from the record" that suppression will handi-

cap prosecution). It also did in *Commonwealth v. Milton*, 461 Pa. 535, 538 n. 1, 337 A.2d 282, 284 n. 1 (1975) ("record establishes" that suppression will handicap prosecution). It is true that in some cases the Court has not specifically acknowledged the record as the basis of its determination, *Steding v. Commonwealth*, 480 Pa. 485, 391 A.2d 989 (1978); *Commonwealth v. Gullett*, 459 Pa. 431, 329 A.2d 513 (1974), but nothing in those cases suggests that the Court went outside the record. It is also true that the Court has cited *Kunkel*, once, in a footnote. *Commonwealth v. Nazarovitch*, 496 Pa. 97, 101 n. 1, 436 A.2d 170, 172 n. 1 (1981). We do not, however, understand that citation as approving the *Martz—Kunkel* procedure; the Court made no reference to that procedure, and only cited *Kunkel* in conjunction with *Bosurgi* as authority for the proposition that a suppression order may be a final order.

We recognize that the three conclusions we have formulated do not embrace every possible sort of Commonwealth appeal from a suppression order. It is easy to imagine an appeal where it is *not* apparent from the record that the order terminates or substantially handicaps the prosecution, and yet where in *fact* it will. Suppose, for example, the order suppresses a gun. The record may disclose that the Commonwealth still has a great deal of other evidence, including eye witnesses to the crime. Thus, on the basis of the record alone we could not say that the suppression of the gun either terminated or substantially handicapped the prosecution. Yet the district attorney may know facts not of record that persuade him, and, if we knew them, would persuade us, that the suppression does substantially handicap the prosecution. For example, the eyewitnesses may all have criminal records, so that the jury may very well not believe them, and the gun may be the basis of powerfully incriminating ballistic evidence. Under *Commonwealth v. Trefry, supra,* and *Commonwealth v. Deren, supra,* the Commonwealth's appeal from the suppression order would lie; for under those cases we would regard ourselves as required to "accept [the] appeal as the Commonwealth's

good faith certification" that the prosecution was substantially handicapped. Even under *Commonwealth v. Martz, supra,* and *Commonwealth v. Kunkel, supra,* or so it would seem, the appeal would lie, so long as the Commonwealth explained in its brief why it believed the prosecution was substantially handicapped; to be sure, by referring to the witnesses' criminal records and the consequent need for ballistic evidence, the explanation would go *outside* the record; but it would not be *inconsistent* with the record. Today, however, we overrule all of these cases.

■ We also recognize that a forceful argument may be made that as a matter of policy the Commonwealth should be permitted to appeal a suppression order in the sort of case we have just supposed.[2] As the Supreme Court observed in *Bosurgi,* if the Commonwealth is forced to go to trial without the suppressed evidence and the result is an acquittal, the case is over. This is equally true, whether the substantial handicap *is* apparent on the record, or is *not* apparent but nevertheless exists. However, if such a policy is to be implemented, it must be by the Supreme Court. We have no power to enlarge our jurisdiction by holding appealable an order that precedent establishes is not appealable. *Toll v. Toll, supra (Gurnick v. Government Employees Insurance Co.,* 278 Pa.Superior Ct. 437, 420 A.2d 620 (1980), overruled). The Supreme Court however, does have that power, 42 Pa.C.S.A. §§ 1701, 5105, which it may exercise, and has exercised, by the promulgation of rules defining when an order, although interlocutory, is appealable, Pa.R.A.P. 311. For our part, we are satisfied that our decision today conforms to the law. We leave to the Supreme Court whether the law should be changed.

## II

Having decided when a suppression order is appealable, we may now examine the two orders, and, if they are appealable, consider whether the evidence they suppressed was properly suppressed.

2. *See* the opinions filed by Judge McEWEN and Judge CIRILLO.

### A

Each of the cases before us involves possession of a controlled substance. In *Commonwealth v. Lapia*, the defendant, appellee here, is charged, among other charges, with possession of, and possession with intent to deliver, three bags of cocaine, which were seized in a search conducted at the Pittsburgh airport. In *Commonwealth v. Dugger*, the defendant, appellee here, is charged with the possession of marijuana, which was seized in a search conducted inside the Chester County Farms Prison. In each case the lower court ordered the controlled substance suppressed as evidence.

■ The facts of each case will be stated more fully below. Even from the little we have said so far, however, it is apparent that the record discloses that in each case the suppression order terminates the prosecution: the Commonwealth cannot prove a defendant's possession of a controlled substance if it cannot prove that it took the substance from the defendant. We therefore hold both orders appealable. The fact that in both cases the Commonwealth failed to comply with the procedure established by *Commonwealth v. Martz, supra,* and *Commonwealth v. Kunkel, supra,* is immaterial, those cases being today overruled.

### B

#### *Commonwealth v. Lapia* *

■ When we review an order suppressing evidence, we are of course not bound by the lower court's conclusions of law. We are bound, however, by the court's findings of fact, if those findings are supported by the record. *See e.g., Commonwealth v. Davis,* 491 Pa. 363, 421 A.2d 179 (1980); *Commonwealth v. Webb,* 491 Pa. 329, 421 A.2d 161 (1980); *Commonwealth v. Cruz,* 489 Pa. 559, 414 A.2d 1032 (1980); *Commonwealth v. Williams,* 287 Pa.Superior Ct. 19, 429 A.2d 698 (1981). We have therefore "refused" "time and

---

* Judge WIEAND and Judge CIRILLO concur in the result reached *infra.*

again" to substitute our own findings for those of the suppression court, *Commonwealth v. Davis, supra* 491 Pa. at 372, 429 A.2d at 181, especially where credibility is at issue, *Commonwealth v. Stamm,* 286 Pa.Superior Ct. 409, 429 A.2d 4 (1981); *Commonwealth v. Butch,* 257 Pa.Superior Ct. 242, 390 A.2d 803 (1978) (court equally divided on other grounds), *remanded on other grounds,* 487 Pa. 30, 407 A.2d 1302 (1979). Mindful of this scope of review, we now turn to a discussion of the facts.

Appellee was arrested on August 8, 1977, and charged with possession of a controlled substance, possession with intent to deliver a controlled substance, criminal conspiracy, and possession of a prohibited offensive weapon. Her arrest was based on the search of a package containing cocaine, which was mailed to her by one Mr. Field. The package had been sent from the Miami airport to the Pittsburgh airport through the "Sprint" delivery service of Eastern Airlines. At the Miami airport, without appellee's knowledge, the package had been opened and its contents searched by an employee of Eastern Airlines, one Mr. Strachan. The testimony regarding the circumstances of this search was in conflict. Specifically, the conflict was between Mr. Strachan's testimony and the testimony of one Detective Sadtler of the Dade County Police, and concerned the extent to which the police had participated in the search.

The lower court, after hearing the testimony, made findings of fact and conclusions of law, as required by Pa.R. Crim.P. 323(i), and submitted a thorough opinion in support of its order granting appellee's motion to suppress. The court's findings and conclusions were as follows:

*Findings of Fact:*

1. That a meeting was held between members of the Dade County Police Department and employees of Eastern Airlines wherein the latter were informed of the shipment of narcotics via Eastern Sprint;

2. That Eastern employees were given a set of guidelines by the Dade County Police to implement in ferreting out the flow of narcotics;

3. That two days subsequent to said meeting, as a result of implementing said guidelines, an Eastern employee suspected that a wrapped package delivered for shipment might contain narcotics and so informed his supervisor, Mr. Strachan.

4. That the package would never have been suspected of containing narcotics but for the meeting and guidelines instructed by the Dade County Police;

5. That Mr. Strachan conveyed said suspicions to the Dade County Police who in turn told Mr. Strachan that he had the authority to open the package;

6. That in reliance upon said direction, Mr. Strachan opened said package and notified the Dade County Police of the contents thereof;

7. That the actions of the Eastern employees in opening and searching the package were, in effect, the actions of the Dade County Police;

8. That Detective Sadtler opened the lid of the package after being informed of its contents after being summoned to Mr. Strachan's office;

9. That the contents were field tested, preliminarily determined to be cocaine, rewrapped and sent via Sprint to the intended destination in Pittsburgh;

10. That Detective Sadtler notified Sergeant James Miles of DEA by telephone in Pittsburgh of the suspected contents of the package;

11. That based sole[l]y upon said information, a search warrant was issued for said package;

12. That said search warrant was executed by Deputy Sheriff McDaniel after Defendant received said package at the Greater Pittsburgh International Airport, and;

13. That pursuant to said search and seizure Defendant was arrested, searched incident thereto, and made statements as a result of said arrest.

*Conclusions:*

1. That Defendant has standing to raise issues regarding the violations of her Fourth Amendment rights under the U.S. Constitution;

2. That Mr. Strachan's actions as agent of the Dade County Police invoked the protections afforded by the Fourth Amendment of the United States Constitution;

3. That no probable cause existed for the search of the package by Mr. Strachan;

4. That no exigent circumstances existed which precluded the necessity for obtaining a search warrant;

5. That Detective Sadtler lacked probable cause in searching the package upon arriving at the office of Mr. Strachan;

6. That no exigent circumstances existed which precluded the necessity of Detective Sadtler from obtaining a search warrant prior to opening the lid of the package and examining its contents;

7. That the search warrant issued in Pittsburgh by Allegheny County Authorities was based on illegally seized evidence;

8. That the arrest of Defendant subsequent to the search and seizure of the package and the items in Defendant's possession and statements made by Defendant simultaneous therewith were fruits of the illegal search and seizure and illegally obtained. Slip op. at 17–20.

The Commonwealth challenges both the lower court's findings of fact and its conclusions of law. It will be convenient to consider, first, the Commonwealth's challenge to the findings, and next, its challenge to the conclusions.

In challenging the lower court's findings, the Commonwealth argues that the search was a private search, outside the Fourth Amendment, because it was initiated and conducted by Mr. Strachan, a private individual. According to the Commonwealth, "police participation occurred only after the initial search by an employee [Mr. Strachan] in the course of his employment." Appellant's Brief at 9.

Under Pa.R.Crim.P. 323(h), the Commonwealth had the burden of establishing that the cocaine was not seized in violation of appellee's rights. Among the witnesses called

by the Commonwealth were Mr. Strachan and Detective Sadtler. Their testimony may be summarized as follows.

Mr. Strachan was supervisor of the Eastern Airlines ticket counters at the Miami airport. Two days before the package containing the cocaine was opened, he was approached by Detective Sadtler and another plainclothes detective. N.T. 2/10/78, 86. Detective Sadtler had copies of Sprint waybills and "informed us that we were shipping a lot of narcotics by Sprint." *Id.* 87. Detective Sadtler also told Mr. Strachan to be on the lookout for "different irregularities that he thought it would be a good thing to watch." *Id.* When asked whether these irregularities included "whatever the contents are reported to be and what the value of the cost of shipment would be, correct?", Mr. Strachan answered, "Correct." *Id.* 88. Detective Sadtler asked Mr. Strachan, and the other supervisors, to call him if they had any questions. *Id.* 92.

About two days later, Mr. Strachan was approached with the package in question by Mr. Delphus, one of the ticket counters. *Id.* 12. Mr. Delphus, who did not testify at the hearing, told Mr. Strachan that the package had been checked in for Sprint delivery by a man who had sent two packages through the Sprint service previously, and who said the package contained tennis grips. *Id.* Mr. Delphus was "a little shaky on the package" because he was not able "to really evaluate why a man would pay $25.00 [the cost of Sprint delivery] to send tennis grips." *Id.* 13. Mr. Strachan also believed "that nobody would pay $26.50 to send a pair of tennis grips to Pittsburgh," *id.* 24, although, he testified, he did not know what tennis grips cost and had never bought one. *Id.* 52–53. Mr. Strachan suspected that the package contained narcotics; he "didn't suspect it contained an explosive." *Id.* 57.

Mr. Strachan then telephoned the Narcotics Division of the Dade County Police and spoke to a man later identified as Detective Sadtler. He "probably said to the gentleman there is narcotics in the box," *id.* 61, and "explained to the gentleman [that he] wanted his opinion on opening the

package," *id.* 65. According to Mr. Strachan, the conversation was as follows:

> Basically I had told the gentleman I had a package that I really wanted to open but I wasn't really sure what the involvement would be. And the gentleman I talked to informed me that he could not give me the authority to open that package. That I did have the authority. In fact he was emphatic about telling me. He said I had no right to tell you to open the package. He said you have to make that decision, and after you make that decision if you need my assistance call me. *Id.* 22–23.

On cross-examination, Mr. Strachan testified further about the conversation:

Q. What did he say to you?

A. He told me he could not give me the authority to open the package.

Q. But you could open it pursuant to the—

A. He said I did have the authority, you have the authority to open the package.

In fact, he emphasized I could not give you the authority. He said you make your decision, and if you need my assistance call me is what I believe he said.

Q. If I understand it correctly the officer told you that he personally could not give you the authority to open the package, but that you in fact did have the authority to open it, correct?

A. Yes, sir.

Q. And that authority was pursuant to the Air Transportation Act, correct? [3]

---

**3.** The Commonwealth does not argue that Mr. Strachan's opening of the package was justified by the Air Transportation Safety Act, 49 U.S.C.A. § 1511 (1976), which provides that an air carrier must refuse to transport the property of any person who does not consent to a search of his property to determine whether it contains "a dangerous weapon, explosive, or other destructive substance." The Commonwealth could not so argue. Mr. Strachan testified that he knew he would have to notify and obtain the consent of someone whose package he wanted to open, N.T. 2/10/78, 37, and that he was unable to get the consent of the shipper of the package in question, Mr. Field,

A. Yes.

Q. Did he say that to you?

A. No. He just said I had the authority to open it. He didn't tell me.

Q. As a result then of what he told you you then decided to open the package, is that correct?

A. Yes, sir. N.T. 2/10/78, 65–66.

About five minutes after this telephone conversation, Mr. Strachan opened the package, saw that it contained white powder, and called the Narcotics Division back. *Id.* 66–67. He spoke to Detective Sadtler again, who came to his office, tested the powder, and determined that it was cocaine.

Detective Sadtler's testimony was contrary to Mr. Strachan's. He said that he first spoke to Mr. Strachan on the telephone *after* Mr. Strachan had opened the package and found that it contained the powder, N.T. 1/27/78, 11–15, 72, 75, and that Mr. Strachan told him that he had opened the package because he was suspicious about the money it would cost to ship tennis grips, *id.* 64–65. To the best of his knowledge, this was the sole reason Mr. Strachan had opened the package. *Id.* 72. Mr. Strachan called him because he was out there. *Id.* 75. Detective Sadtler agreed that he had met with airline supervisors and told them to call him if they saw any suspicious packages, *id.* 61, but he denied giving them any guidelines to detect suspicious packages, *id.* He also said that he did not meet Mr. Strachan when he met the supervisors but met him for the first time in the airline office after the package had been opened. *Id.* 55.

■ After remarking upon the contradictions between Mr. Strachan's testimony and Detective Sadtler's, slip op. at 12–14, the lower court credited Mr. Strachan's, expressly stating that "the Court finds the testimony of Detective Sadtler lacking credibility in the key area of the Dade County Police contacts and communications with Eastern

*id.* 55. Also, Mr. Strachan said that he did not think the package contained explosives. *Id.* 57.

employees." *Id.* 12. This finding is dispositive, for we must accept it, especially since it resolves an issue of credibility. *Commonwealth v. Stamm, supra; Commonwealth v. Butch, supra.* Accepted as credible, Mr. Strachan's testimony adequately—in fact, amply—supports the lower court's findings concerning the extent to which the police participated in the search. The Commonwealth's argument challenging these findings is therefore without merit.

As we have mentioned, the Commonwealth also challenges the lower court's conclusions of law, which have been quoted *supra* at 283. The critical conclusions are Number 2, that in searching the package, Mr. Strachan was acting "as agent of the Dade County Police," thereby bringing into play the protection afforded by the Fourth Amendment, and Number 3, that there was no probable cause for the search.

 The Fourth Amendment is a limitation on the government only. Accordingly, evidence gained by a private search is not subject to being excluded as evidence seized in violation of the amendment. *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *Commonwealth v. Adams,* 234 Pa.Superior Ct. 475, 341 A.2d 206 (1975).[4] However, it does not follow from the fact that a search was conducted by a private individual, rather than a government official, that the search was private, if the search was requested or otherwise instigated by government agents, or if the agents have participated in it in some way. *Commonwealth v. Dembo,* 451 Pa. 1, 301 A.2d 689 (1973); *Commonwealth v. Borecky,* 277 Pa.Superior Ct. 244, 419 A.2d 753 (1980); LaFave, 1 *Search and Seizure* § 1.6(b) (1978). The reason for this rule was discussed in *Commonwealth v. Dembo, supra.* In *Dembo,*

**4.** In support of this rule, it has been said that "the exclusionary rule would not likely deter the private searcher, who is often motivated by reasons independent of a desire to secure criminal conviction and who seldom engages in searches upon a sufficiently regular basis to be affected by the exclusionary sanction." LaFave, 1 *Search and Seizure* § 1.6 (1978).

the state police, acting on information from the federal authorities that the defendant was involved in LSD manufacturing, asked the postal service to notify them if the defendant received any packages in the mail. About two months after the request, the assistant postmaster notified the police that the defendant had received a package, and, "at the request and direction of the trooper," opened the package, which contained hashish. The Supreme Court held the search governmental and violative of the Fourth Amendment, saying:

> Here, the record is clear that the postal authorities were merely a tool used by the police officials to further a police investigation. The record is barren of any facts that would have permitted the police officials in the case at bar to open this parcel and examine its contents. The Commonwealth seeks to sustain the search relying upon the fact that the postal authorities physically opened the package and not police officials. The Fourth Amendment reaches the very core of the American concept of the dignity of the individual, thus to allow its protection to be defeated by the most obvious subterfuge would reflect little deference to a heritage we have given so much to sustain.

* * * * *. *

> The overwhelming evidence forces the conclusion that this search was initiated by police officials in furtherance of a police investigation then in progress and the postal authorities were merely the means selected in an attempt to avoid the necessity of establishing probable cause.

* * * * * *

> In the case at bar, there can be no doubt that the police actively participated in the search of the package addressed to the appellant. To permit such concerted effort among the police and postal authorities in an attempt to circumvent the appellant's constitutional rights cannot be done. *Id.* 451 Pa. at 7–11, 301 A.2d at 693, 695.

*Accord, United States v. Jennings,* 653 F.2d 107 (4th Cir.1981) ("government agent may not avoid constitutional

restraints upon his conduct by procuring a private individual to perform a forbidden act for him").

Searches by airline employees are frequently challenged as governmental searches under the Fourth Amendment. *See*, Note, *Private Air Freight Searches and the Fourth Amendment*, 10 Golden Gate L.Rev. 131 (1980). Each case turns on the extent of the government's involvement, and a search that the government has encouraged or actively participated in is not private but governmental. *Compare United States v. Jennings, supra* (airline employee decided to open package himself, before he telephoned government agent); *United States v. Andrews*, 618 F.2d 646 (10th Cir.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980) (airline employee opened package without any prior consultation with government officials), *with United States v. Walther*, 652 F.2d 788 (9th Cir.1981) (airline employee opened package after government agent had encouraged him to open it and he had reasonable expectation of reward).

Although not in the context of an airline search, our Supreme Court considered the issue of whether a search was governmental for the first time in *Commonwealth v. Dembo, supra.* As discussed above, the fact that the search was governmental was straightforward because the state police had specifically requested the search. The principle enunciated in *Dembo*, however, was later applied and clarified in *Commonwealth v. Borecky, supra*, a case not so straightforward as *Dembo*, and one that provides us with guidance in deciding the matter before us.

In *Borecky*, a private individual searched a house and found marijuana. A state trooper testified that he knew the individual was going to search the house, and that he waited about a mile away while the house was being searched to see the outcome. We said: "To reiterate, it appears that Trooper Leganza was in contact with the informant for a period of time prior to the search; and, although it might not be inferred that Trooper Leganza either explicitly or implicitly instructed the informant to

search appellant's residence for evidence, it cannot be gain-said that the warrantless search was conducted with the prior knowledge and concurrence of the trooper." *Id.* 277 Pa.Superior Ct. at 249, 419 A.2d at 756. The conclusion followed that the "prior knowledge of the warrantless search, and acquiescence therein, was sufficient to consti-tute ratification" on behalf of the Commonwealth. *Id.*, 277 Pa.Superior 251, 419 A.2d 757.

Here the government agent, Detective Sadtler, participated more deeply in the search than did the trooper in *Borecky*. Like the trooper, the detective had prior knowledge of the search. (He denied he did but the lower court did not believe him.) Also like the trooper, the detective awaited and acquiesced in the result of the search. In addition, though, when, prior to the search, Mr. Strachan called to get the detective's opinion on opening the package, the detective "emphatica[ally]" told him that he had the authority to open the package, although this was in fact not so. The lower court therefore said, quite correctly, that "[b]y explicitly telling Mr. Strachan that he had the authori-ty to open the package, the Court finds that the narcotics agents in effect directed him to do so ..." Slip op. at 11. Under *Borecky*, a finding of instruction by the government agent to the private searcher is unnecessary; "prior knowl-edge of the warrantless search, and acquiescence therein, [are] sufficient." Here, in addition to prior knowledge and acquiescence, there was instruction by the government agent, as in *Commonwealth v. Dembo, supra.* Mr. Stra-chan did not open the package on his own initiative but, as he testified, as a result of his conversation with Detective Sadtler. *See* Comment, *Police Bulletins and Private Searches*, 119 U.Pa.L.Rev. 163 (1970) (suggesting "but for" cause sufficient in cases short of explicit instruction by police to individuals); LaFave, 1 *Search and Seizure* § 1.6(c) (1978) (ibid).

In addition, we note that the search had no purpose independent of discovering the drugs, which was a purpose benefiting the police and not the airline. As Mr. Strachan

testified, he believed the package contained drugs (of concern to the police) and not explosives (of concern to the airline). The purpose of the search is an important factor in determining whether it was private or governmental. *See Commonwealth v. Eshelman,* 477 Pa. 93, 383 A.2d 838 (1978) (off-duty policeman's search held governmental where he searched automobile for drugs "solely for the purpose of turning it over to his superior on the police force"); *Commonwealth v. Dembo, supra* (postal clerk's search held governmental where did not open package in furtherance of postal business but "was no more than an instrument used by police officers to further their investigation"); *Commonwealth v. Borecky, supra* (informant's search of private home with prior knowledge of police); *Commonwealth v. Kozak,* 233 Pa.Superior Ct. 348, 336 A.2d 387 (1975) (airline employee's search of baggage undertaken in normal course of duties to identify owner and without prior consultation or knowledge of police).

It is therefore clear that the lower court properly concluded that the search was governmental, and so within the Fourth Amendment.

■■■ Having decided that the search was governmental, we must now decide whether it was permissible under the Fourth Amendment, *i.e.,* whether there was probable cause to conduct it.[5] In concluding that there was no probable cause for the search, the lower court said that "mere conjecture that the cost of shipment [of the tennis grips] exceeds the value of the item being shipped does not constitute 'probable cause'" for believing that the package contained drugs. Slip op. at 16. This conclusion was clearly proper.

■■■ The only evidence of probable cause produced by the Commonwealth was the testimony of Mr. Strachan. He testified that the only thing that made him suspicious about the box was that it would not be worthwhile for someone to

5. There can be no doubt that appellant had a privacy interest in the package. *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

pay $26.50 to ship tennis grips to Pittsburgh. N.T. 2/10/78, 53. However, he also testified that he did not know the cost of tennis grips but had only an "opinion of what tennis grips cost." *Id.* 53. He further testified: "My concern was that I just did not believe that there were tennis grips in that box. And if it were being falsified I wanted to know what was in the box." *Id.* 51. This testimony amounts to no more than Mr. Strachan's suspicion that the package contained drugs, which has never been held sufficient for probable cause. *Commonwealth v. Kelly,* 487 Pa. 174, 409 A.2d 21 (1979) (conduct of defendant and appearance of vial containing drugs insufficient for probable cause because merely officers' suspicion); *Commonwealth v. Greber,* 478 Pa. 63, 385 A.2d 1313 (1978) ("curiosity" and "hunch" that shopping bag contained heroin insufficient for probable cause to open bag); *Commonwealth v. Jackson,* 461 Pa. 632, 337 A.2d 582, *cert. denied,* 423 U.S. 999, 96 S.Ct. 432, 46 L.Ed.2d 376 (1975) (suspicious and furtive behavior of defendants insufficient probable cause to search automobile); *Commonwealth v. Knowles,* 459 Pa. 70, 327 A.2d 19 (1974) ("suspicion" of officer aroused by defendant's slumping down in seat insufficient probable cause to search paper bag); *Commonwealth v. Boyer,* 455 Pa. 283, 314 A.2d 317 (1974) ("unusual look" by defendant insufficient probable cause to search automobile console). Moreover, there was no evidence, as there has been in some cases, that the police had a reliable tip that the package contained drugs, *see Commonwealth v. Minoske,* 295 Pa.Superior Ct. 192, 441 A.2d 414 (1982); *Commonwealth v. Hughes,* 268 Pa.Superior Ct. 536, 408 A.2d 1132 (1979), or that the package had an appearance justifying the belief that drugs were probably inside, *see Commonwealth v. Veal,* 287 Pa.Superior Ct. 113, 429 A.2d 1125 (1981); *Commonwealth v. Whitner,* 241 Pa.Superior Ct. 316, 361 A.2d 414 (1976).

Mr. Strachan's suspicion is made all the more unreliable by his status as a civilian who was untrained and inexperienced in making such judgments. The Supreme Court has recognized that the expertise of even the police is limited to

some extent. *See Commonwealth v. Kelly, supra* ("We reject as preposterous the notion that anyone possesses expertise to render an opinion on the contents of a vial as seen in appellant's car"). *A fortiori*, the suspicions of an airline ticket counter supervisor untrained and inexperienced regarding drugs are even more questionable. *See United States v. Andrews, supra* (danger of private searches is that private individuals are not trained to minimize invasions of privacy or property rights).

The Commonwealth had the burden of proving that the cocaine was not seized in violation of appellant's constitutional rights. *Commonwealth v. Ohle*, 291 Pa.Superior Ct. 110, 435 A.2d 592 (1981); Pa.R.Crim.P. 323(h). Testimony by a witness that "if" the contents of the package "were being falsified," he "wanted to know what was in the box," was insufficient to meet that burden. We shall therefore affirm the lower court's order suppressing the evidence obtained from the illegal search of the package in Miami and also suppressing as the fruits of that search the seizure of the package in Pittsburgh and the arrest of appellee.[6]

### *Commonwealth v. Dugger* ⁎⁎

We have already noted, *supra* at page 279, that we are bound by the suppression court's findings of fact, if those findings are supported by the record, and that we may therefore not substitute our findings for the suppression

---

**6.** Since Mr. Strachan opened and searched the package, we do not address the question whether he had "reasonable suspicion" sufficient to detain it for a brief time. *United States v. Van Leeuwen*, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970) (nature, weight and fictitious return address on package justified its detention while warrant to open it obtained). *Compare United States v. Martell*, 654 F.2d 1356 (9th Cir.1981) (momentary detention of luggage justified while drug detecting dog arrived and established probable cause) *with United States v. Place*, 660 F.2d 44 (2d Cir.1981) (two hour detention of baggage violated fourth amendment). Also, since we find that no probable cause for the search existed, it is unnecessary to decide whether exigent circumstances existed, or whether any second opening by Detective Sadtler in the airlines office was illegal.

⁎⁎ Judge CAVANAUGH, in an opinion joined by Judge MONTEMURO, concurs in the result reached *infra*. Judge WIEAND, in an opinion joined by Judge McEWEN and Judge CIRILLO, dissents.

court's. *Commonwealth v. Davis, supra; Commonwealth v. Webb, supra; Commonwealth v. Cruz, supra.* This principle has particular application to the discussion that follows, for as will appear, the critical issue is whether appellee voluntarily consented to a strip search. When a voluntary consent is alleged, we have said:

> It is true that voluntariness of consent rests upon all the surrounding facts and circumstances, and great deference should be given to the decision of the hearing court since that court has had the opportunity to observe the appearance and demeanor of the witnesses and the defendants. *Commonwealth v. Richard,* 233 Pa.Superior Ct. 254, 261, 336 A.2d 423, 426, *cert. denied, sub. nom., Santos v. Pennsylvania,* 423 U.S. 1017, 96 S.Ct. 452, 46 L.Ed.2d 389 (1975).

The findings of the lower court are stated in its opinion as follows:

> The facts are very simply stated. The defendant appeared at the Chester County Farms Prison to visit his brother who was there incarcerated. Prior to the defendant's arrival, the prison authorities received a message from the Chester County police radio that an unidentified female caller had advised them by telephone that Billy Dugger was on his way to the prison to see his brother and had marijuana in balloons concealed on his person. On the defendant's arrival at the prison, the defendant was admitted to the prison and ushered into an inside room upon passage through two steel doors. There in the presence of three correctional officers in uniform and behind locked doors, the defendant was advised that he was suspected of having contraband and in order to be allowed in for a visit he would have to submit to a strip search. The defendant began to remove his clothing and the substance which was seized was found on the floor after the defendant removed his shoes.
>
> \* \* \* \* \* \*
>
> Despite the record showing that the defendant was once advised that if he did not submit to the search, that

he had to leave, we could not find upon the circumstances of the search which includes admission into the prison, being guard-lead [*sic*] through steel doors that were subsequently locked and being led into a confined area and in the presence of three uniformed officials where the strip took place in an extremely brief period of time that the consent was knowing and voluntary. Slip op. at 1–3.

The testimony that led the lower court to make these findings may be summarized as follows:

On June 22, 1980, at about 9:30 a.m., Ms. Mary Stamper, a telephone operator for Chester County police radio, received a telephone call from an older woman who refused to identify herself. N.T. 10/22/80, 5–7. The woman said that one Billy Dugger [appellee] was on his way from Delaware to Chester County Farms Prison to visit his brother, Eddie, with marijuana concealed in a balloon on his person. *Id.* 7–8. Ms. Stamper called the prison and conveyed this information to Staff Sergeant Reed. *Id.* 6. Sergeant Reed conveyed it in turn to Sergeant Walker, who is also employed at the prison. *Id.* 13. Sergeant Reed told Sergeant Walker that if appellee "did, indeed, sign in for a visit, I was to go down with another officer and approach that person and explain to him that he was suspected of having contraband and that in order for him to proceed with his visit, he would have to submit to a strip search. If not, he would have to leave the premises without a visit, without entering the institution." *Id.* When appellee did sign in for a visit, Sergeant Walker went with Sergeant Langum to meet him. *Id.* 14.

Visitors to Chester County Farms Prison are required to sign in at a building outside the main building. *Id.* 21 (Walker). They are then "allowed through a gate in the fence by canine." *Id.* Next, they are lead through a fenced-in area called a side port, and enter the building through a locked door, which leads into the "Mud Room." The Mud Room is where visitors leave items such as coats, hats, and umbrellas. *Id.* The Mud Room has an outer door and an inner door. An officer admits visitors through the

outer door, then the officer admits them through the inner door. *Id.* Both doors are steel and must be unlocked. *Id.* 22.

It was in the Mud Room that appellee was met by Sergeants Walker and Langum, and also by Corrections Officer Mazza, who joined them there. *Id.* 22. Sergeant Walker asked appellee to come with them. *Id.* 24. Officer Mazza then left the group, *id.*, which proceeded further into the prison through another locked door, *id.* 16, down a hallway, and turned right into "an isolated maintenance shop area," *id.* The three then entered the maintenance storeroom, which is an area closed off from the rest of the maintenance shop by a locked steel door. *Id.* 25. The maintenance store room is "not a very big room ... about seven foot wide, maybe fifteen, eighteen foot long." *Id.* 23. It has no windows except in the door, and those are curtained. *Id.* 26. Once inside, appellee was separated from the outside by two locked doors—the inner door of the Mud Room and the storeroom door. *Id.* 24.

There, in the presence of Sergeant Langum, who did not testify at the hearing, Sergeant Walker said to appellee:

> I told him that you were suspected of having contraband, and in order for you to be allowed in for a visit, you would have to submit right now to a strip search. *Id.* 27. *See id.* 14, 16.

Sergeant Walker testified that he did not tell appellee that he did not have to submit to a strip search. *Id.* 17. In describing appellant's response, Sergeant Walker was inconsistent. At first he testified that "I had no sooner said that he would have to submit to one, and he said something like okay, or sure. And with that, removed the belongings from his pockets." *Id.* 17. But later he testified that appellee did not say anything in response. *Id.* 27. Appellee started to undress, and when he took off his shoes, three red balloons fell onto the floor. *Id.* 18. Sergeant Walker then called "Control," and appellee was taken upstairs to the holding tank area to "have his rights read." *Id.* 20.

The Commonwealth argues that appellee's consent to the search was voluntary because "it is implicit in the warning that was given that an alternative was available to him [appellee]—namely, that if he chose to leave without visiting his brother he would not be subject to a search." Appellant's Brief at 9. This argument is without merit, for it amounts simply to a disagreement with the lower court's findings. As the lower court pointed out, appellee's being told "if he did not submit to the search, that he had to leave" was only one of the circumstances disclosed by the evidence, the other circumstances "includ[ing] admission into the prison, being guard-lead [*sic*] through steel doors that were subsequently locked and being led into a confined area and in the presence of three uniformed officials," all this occurring "in an extremely brief period." Slip op. at 3. Also, the court noted, "The prison did not utilize a consent form ..." *Id.* at 2. We have long held that voluntariness is a question of fact. *Commonwealth v. Merbah,* 270 Pa.Superior Ct. 190, 411 A.2d 244 (1979) ("It is well settled that voluntariness of consent to search is a question of fact which must be determined from the totality of the circumstances prevailing in each particular case."); *Commonwealth v. Watkins,* 236 Pa.Superior Ct. 397, 344 A.2d 678 (1975) (*ibid.*). Moreover, as we noted at the beginning of our discussion, "[G]reat deference should be given to the decisions of the hearing court" on the issue of voluntariness, since that court "has had the opportunity to observe the appearance and demeanor of the witness and the defendant[ ]." *Commonwealth v. Richard, supra.* Here the lower court's finding that appellee did not voluntarily consent to a strip search is supported by the record. We must therefore accept the finding. *See* cases cited *supra* at 294.

The Commonwealth argues, however, that in making its finding, the lower court applied an incorrect legal standard, namely, that appellee's consent had to be both "knowing and voluntary." In support of this argument, the Commonwealth relies on *Schneckloth v. Bustamonte,* 412 U.S. 218,

93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Appellant's Brief at 7–9.

 It is true that after *Schneckloth* proof of knowledge of the right to refuse to consent is not a "necessary prerequisite," *id.* at 232, 93 S.Ct. at 2050, to demonstrating that consent to a custodial search was voluntary. However, the Court in *Schneckloth* made clear that whether the subject of a search has knowledge of his right to refuse to consent to the search *is* a factor, to be considered with all of the other circumstances.

Our decision today is a narrow one. We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent. *Id.* at 248–49, 93 S.Ct. at 2058–2059.

Thus, the mere fact that here the lower court found that appellee's consent was not "knowing and voluntary" does not mean that it applied an incorrect standard. To the contrary, it is clear from the court's discussion that the court considered the fact that appellee was not informed of his right to refuse to consent to the search as only one factor among all of the other circumstances. Thus, while the court did cite the fact that "[t]he prison did not utilize a consent form," which presumably would have informed appellee of his right to refuse to consent to the search, the court also discussed, in detail, the generally intimidating atmosphere of the prison, the passage through locked doors, the presence of the uniformed sergeants, and the isolation of the strip search area.

Indeed, *Schneckloth* is against the Commonwealth's position, for the Court's discussion there makes plain how difficult it is to prove voluntary consent when the setting is, as it was here, coercive. At issue in *Schneckloth* was the search of an automobile trunk beside a busy highway. The Court expressly reserved the question of "what effect custodial conditions might have on a search authorized solely by an alleged consent," *id.* at 247 n. 36, 93 S.Ct. at 2058 n. 36, and pointed out that some settings are "inherently" and "presumptively" coercive:

In this case, there is no evidence of any inherently coercive tactics—either from the nature of the police questioning or the environment in which it took place. Indeed, since consent searches will normally occur on a person's own familiar territory, the specter of incommunicado police interrogation in some remote station house is simply inapposite. There is no reason to believe, under circumstances such as are present here, that the response to a policeman's question is presumptively coerced; and there is, therefore, no reason to reject the traditional test for determining the voluntariness of a person's response. *Miranda*, of course, did not reach investigative questioning of a person not in custody, which is most directly analogous to the situation of a consent search, and it assuredly did not indicate that such questioning ought to be deemed inherently coercive. *Id.* at 248–49, 93 S.Ct. at 2058–2059 (footnote omitted).

*And see United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976) (consent search valid where "no promises made to [accused] and no indication of more subtle forms of coercion that might flaw his judgment. He had been arrested and was in custody, but his consent was given while on a public street, not in the confines of the police station.").

Our Supreme Court has also emphasized the difficulty of proving voluntary consent in a coercive setting. Thus, in *Commonwealth v. Smith*, 470 Pa. 220, 368 A.2d 272 (1977), the Court said that "custody when coupled with other

coercive factors will normally necessitate the conclusion that the consent is not effective." *Id.*, 470 Pa. 228–229, 368 A.2d at 277. *And see Commonwealth v. Pytak*, 278 Pa.Superior Ct. 476, 420 A.2d 640 (1980); *Commonwealth v. Dressner*, 232 Pa.Superior Ct. 154, 336 A.2d 414 (1975); *Commonwealth v. Griffin*, 232 Pa.Superior Ct. 163, 336 A.2d 419 (1975). *See also* Torcia, 1 *Wharton's Criminal Procedure* § 181 (1974) (prosecution's burden is "obviously greater where the claimed consent was given while the accused was under arrest or otherwise in custody.").

One further observation is in order. While the fact of custody is by itself inherently coercive, it will in some cases be accompanied by other facts that enhance the coerciveness. *Commonwealth v. Dressner, supra. See* LaFave, 2 *Search and Seizure* § 8.29(b) (1975) (uniformed guards, firearms, interrogation, stationhouse setting). Here, there are many such other facts. Appellee was searched in an isolated room deep within a prison. *See Bell v. Wolfish*, 441 U.S. 520, 537, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979) ("Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents in such a facility.") Thus, the setting was more coercive even than a stationhouse. *See Hackett v. State*, 386 So.2d 35, Fla.App., *pet. denied*, 392 So.2d 1379 (Fla.1980) (police station was coercive setting because "not free to leave"). Appellee was asked to undress in the presence of two uniformed guards. Also, he was not advised of his constitutional rights under *Miranda*. In other cases, the fact that the subject *was* so advised has been considered "the most persuasive fact in concluding that a consent was voluntarily granted despite the coercive atmosphere of an arrest" or an otherwise custodial situation. *Commonwealth v. Tribblett*, 242 Pa. Superior Ct. 164, 166–168, 363 A.2d 1212, 1213 (1976). *See also Commonwealth v. Griffin, supra* (accused "repeatedly apprised of *Miranda* rights"); *Commonwealth v. Richard, supra* (troopers "repeated explanations" of constitutional rights); *Commonwealth v. Dressner, supra* (accused

was an experienced policeman "who doubtless had full knowledge of the constitutional rights which attach"). Finally, in appraising voluntariness it may be important whether the "facts indicate the consenter believed the evidence to be so well concealed that it probably would not be discovered." *Commonwealth v. Dressner, supra* 232 Pa. Super. at 158, 336 A.2d at 416. Here, appellee must have known that the marijuana would be discovered; it fell out of his shoe, and he had been informed by Sergeant Walker that the search would require him to strip. *Cf.* Torcia, 1 *Wharton's Criminal Procedure* § 181 (1974) (citing cases from other jurisdictions finding consent genuine "where the accused believes that the incriminating evidence or contraband [is] so well concealed as to escape detection").

The lower court's finding that appellee's consent to the search was not voluntary is therefore not only supported by the record, but is consistent with other decisions involving the issue of voluntary consent in a coercive setting.

No doubt anticipating this holding, the Commonwealth makes an alternative argument. Even if not consensual, it argues, the search of appellee was justified under the Act of May 11, 1911, P.L. 274, § 4, 61 P.S. § 384, which provides:

> The warden or superintendent of the prison is hereby authorized to search or to have searched any person coming to the prison as a visitor, or in any other capacity, who is suspected of having any weapon or other implement which may be used to injure any convict or person, or in assisting any convict to escape from imprisonment or any spirituous or fermented liquor, drug, medicine, poison, opium, morphine, or any other kind or character of narcotics, upon his person.

The lower court rejected this argument. It held that the Act must be construed as consistent with the Fourth Amendment; that this meant that the prison officials had to have probable cause to conduct the search; and that here they did not. Slip op. at 1. While we agree that the Act did

not justify the strip search of appellee, we reach that conclusion by reasoning different from the lower court's.

The lower court was certainly correct that the Act must be construed as consistent with the Fourth Amendment, for the General Assembly may not provide less protection than is afforded by the United States Constitution. However, it does not follow, in our opinion, that the prison officials had to have "probable cause" to search appellee. Under the Act, "The warden or superintendent of the prison is ... authorized ... to have searched any person coming to the prison ... *who is suspected* of having any ... narcotics ... upon his person." (Emphasis added.) In summary, the view of the lower court was that this language should be construed to mean, "who is *believed upon probable cause* [to] hav[e] ... narcotics ...." While the view is arguably correct, we are nevertheless persuaded to a different view.

The Fourth Amendment of the United States Constitution, as is also so of Article 1, Section 8 of the Pennsylvania Constitution, prohibits only "unreasonable searches and seizures." *See Delaware v. Prouse,* 440 U.S. 648, 653–654, 99 S.Ct. 1391, 1395–1396, 59 L.Ed.2d 660 (1979) (essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials); *Bell v. Wolfish, supra* 441 U.S. at 558, 99 S.Ct. at 1884. The question we must decide therefore seems to us to be whether, in authorizing the search of a person only "suspected" of having narcotics, the Act of 1911 authorizes an "unreasonable" search. In other words: If it may be reasonable for prison officials to search a person only "suspected" of having narcotics, then to construe the Act as consistent with the Fourth Amendment, it is not necessary to read into it, as the lower court did, the requirement that the prison officials must have "probable cause" to conduct a search. It is only necessary to read into the Act, first, that the person must be *"reasonably suspected"* of having narcotics; second, that after being informed that before he may make his visit he must submit to a search, the person must *consent* to be searched;

and third, that the search that the warden then conducts must be a *"reasonable* search." As will appear, we have concluded that the Act should be construed in this manner, but that even so, the search here was unauthorized because the first two requirements of the Act were not satisfied. We therefore do not consider whether the remaining requirement of the Act was satisfied.

The United States Supreme Court has said that there is no test of reasonableness "capable of precise definition or mechanical application." *Bell v. Wolfish, supra* at 559, 99 S.Ct. at 1884. Rather, determining reasonableness involves balancing the intrusion on the individual's Fourth Amendment rights against the government's need to conduct the intrusion. *Delaware v. Prouse, supra; Bell v. Wolfish, supra.* In addition, "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish, supra* at 559 (citing cases).

Here, the Commonwealth argues that its interest in controlling the problem of "prison smuggling" justifies conducting searches of persons visiting a prison, for "a penitentiary is a unique institution fraught with sensitive security hazards, not the least of these being smuggling of contraband such as drugs, money, knives, etc. The state has a high security interest in eliminating smuggling into and out of penitentiaries." Appellant's Brief at 10, *quoting Gettleman v. Werner*, 377 F.Supp. 445 (W.D.Pa.1974). This interest is without doubt of great concern, and has been held to justify a visual cavity search of prisoners after a contact visit, *Bell v. Wolfish, supra*, and also, the complete denial of contact visits by pre-trial detainees, *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754 (3d Cir.1979) (denial of contact visits does not violate due process rights of prisoners so as to support § 1983 action).

On the other side of the balance is the intrusion on the privacy of the person visiting the prison, especially the intrusion represented by a strip search. Although there are

more intrusive types of searches, *see Bell v. Wolfish, supra* (visual cavity search), a strip search is nevertheless a "profoundly intrusive event." *In Re French,* 106 Cal.App.3d 74, 164 Cal.Rptr. 800, 804 (1980). *See United States v. York,* 578 F.2d 1036 (5th Cir.) *cert. denied,* 439 U.S. 1005, 99 S.Ct. 619, 58 L.Ed.2d 682 (1978) (strip searches and body cavity searches among the most intrusive.). "Indeed, a strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience." *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).

■ Balancing these interests is a difficult task. As one court has said, "A naked man in chains poses no risk. From that point on, every increase in freedom brings at least some decrease in security." *Valentine v. Englehardt,* 474 F.Supp. 294 (D.N.J.1979). However, after balancing the Commonwealth's interest in controlling the flow of contraband into prisons, and a citizen's privacy interest when he visits a prison inmate, we have concluded that the Act authorizes the prison officials to inform a person who wishes to visit an inmate that if he wishes to go through with the visit, he must submit to a search, so long as the officials *reasonably suspect* the person of having narcotics in his possession. We do not believe that the Fourth Amendment requires that before so informing a prospective visitor, the prison officials must have *probable cause* to suspect the possession of narcotics.

In thus adopting a reasonable suspicion, as contrasted to a probable cause, standard, we have the support of other courts. Thus, one court has held that a reasonable suspicion standard "is flexible enough to afford the full measure of fourth amendment protection without posing an insuperable barrier to the exercise of all search and seizure powers." *Hunter v. Auger, supra* at 674 (adopting reasonable suspicion standard for strip searches of visitors in contact visits in prison). *And see, United States v. Asbury,* 586 F.2d 973 (2d Cir.1978) (reasonable suspicion standard adopted for strip searches at border); *United States v. Afanador,* 567 F.2d 1325 (5th Cir.1978) (reasonable suspi-

cion standard adopted for strip searches at border); *United States v. Himmelwright,* 551 F.2d 991 (5th Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977) (reasonable suspicion standard adopted for customs searches as "functional equivalent" of border searches); *Wool v. Hogan,* 505 F.Supp. 928 (D.Ver.1981) (adopting reasonable suspicion standard for prison searches).

The question therefore arises whether here the prison officials did "reasonably suspect[ ]" appellee of having narcotics on his person. *Hunter v. Auger, supra,* is instructive in this regard, for that case involved facts similar to facts of this case.

In *Hunter* there were several appellants, all relatives of inmates in Iowa prisons who had gone to the prisons to have a contact visit with an inmate. Prison officials had received anonymous tips that the relatives would be attempting to smuggle drugs into the prisons. On the basis of these tips, the officials designated the appellants for a strip search. It was stipulated that none of the inmates had been arrested or convicted of drug charges. Two of the appellants, both wives of the inmates, were strip searched. In the third case, the mother and brother of an inmate refused to be strip searched; they therefore left without visiting.

First the court in *Hunter* decided, as we have just decided, to adopt the reasonable suspicion standard. The court then held, however, that the anonymous tips did not pass muster even under that standard and that the searches had therefore violated the Fourth Amendment. Said the court:

To the extent that a strip search designation results from an uncorroborated anonymous tip containing a bare allegation of an attempt to carry drugs into a prison, the strip search policy at issue here unreasonably infringes on rights guaranteed by the fourth amendment.

In reaching this conclusion we are cognizant that informants' tips may vary enormously in their value to prison authorities faced with the duty of intercepting drugs or other contraband. For this reason we do not formulate

one rule designed to encompass all conceivable situations. We note, however, that an anonymous tip completely lacking in indicia of reliability requires further investigation and some measure of corroboration to warrant official action. *See Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972). Although in the context of this case the tip need not meet the standards of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the information must nevertheless possess indicia of reliability sufficient to give prison officials reasonable grounds to suspect drug smuggling activity. *See Adams v. Williams,* 407 U.S. at 147, 92 S.Ct. at 1924; *United States v. Afanador,* 567 F.2d [1325] at 1328–29; *Ballou v. Massachusetts,* 403 F.2d 982, 986 (1st Cir.1968), *cert. denied,* 394 U.S. 909, 89 S.Ct. 1024, 22 L.Ed.2d 222 (1969). Reasonable suspicion can exist only if the information contained in the tip is linked to other objective facts known by correctional authorities. 407 U.S. at 147, 92 S.Ct. at 1924; 403 F.2d at 986. A strip search designation in the absence of any information to buttress the bald assertion contained in the anonymous tip is clearly not based on a reasonable suspicion of drug smuggling activity. It is based on nothing more than a mere, unfounded suspicion of illegal conduct, and the resulting strip search constitutes an exercise of standardless, unconstrained discretion by prison officials in violation of the fourth amendment. *See Delaware v. Prouse,* 440 U.S. at 661, 99 S.Ct. at 1400. *Hunter v. Auger, supra* at 675–76 (footnote omitted).

◼ We agree with this reasoning. Applying it, we hold that the anonymous tip from a female caller that appellee would be bringing marijuana into the Chester County Farms Prison did not constitute a "reasonable suspicion," without corroborating circumstances or some indicia of reliability. *Commonwealth v. Anderson,* 481 Pa. 292, 392 A.2d 1298 (1978) (anonymous tip with no corroboration not

reasonable suspicion to justify pat down); *Commonwealth v. Williams*, 298 Pa.Superior Ct. 466, 444 A.2d 1278 (1982) (common report of neighbors with no corroboration that defendant stole ten-speed bicycle not reasonable suspicion to justify stop); *Commonwealth v. Cruse*, 236 Pa.Superior Ct. 85, 344 A.2d 532 (1975) (anonymous tip with no corroboration not reasonable suspicion to search vehicle). *Cf.: Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (anonymous informant with corroborating circumstances); *Commonwealth v. LeSeuer*, 252 Pa.Superior Ct. 498, 382 A.2d 127 (1977) (*ibid.*). The search of appellee therefore violated the Fourth Amendment, and, in turn, the Act of 1911.[7]

As we have said, the requirement of reasonable suspicion is not the only requirement of the Act of 1911. If the prison officials *had* had a reasonable suspicion that appellee

7. Judge CAVANAUGH joined by Judge MONTEMURO, and Judge WIEAND joined by Judge McEWEN and Judge CIRILLO, would hold that reasonable suspicion was proved. In his opinion Judge WIEAND argues that even though the facts corroborating the tip were "innocent in nature," they were nevertheless sufficient to establish reasonable suspicion. Concurring and Dissenting slip op., WIEAND, J. at 902. But this seems to us to be after-the-fact reasoning. An anonymous tipper may tell the police that at a given hour of a given day, A will do something perfectly legal (like visit a prison), and may also tell the police (on the basis of a wild guess) that A will have drugs. The fact that A then does the legal activity at the stated hour is not a basis for a *reasonable* suspicion that A has drugs; A's visit is legal activity that in no way corroborates the existence of illegal activity. For the reasonableness of the police suspicion can be no greater than that of their source, and the police don't know who the source is, and the source's suspicion was unreasonable—it was based on a wild guess. The fact that the tipper's unreasonable suspicion, and the police's, happened to be right is irrelevant, for reasonable suspicion is an antecedent requirement, *see Commonwealth v. Cruse, supra,* just as the fact that an officer finds contraband on the defendant's person when he arrests the defendant, or in the defendant's home when he searches the home, is irrelevant to the issue of whether the officer had probable cause for the arrest, or the search, *see United States v. Forsythe,* 429 F.Supp. 715 (D.C.Pa.1977) (A search is not validated by what it turns up); *Commonwealth v. Sellers,* 236 Pa.Super. 191, 344 A.2d 689 (1975) (Search, illegal at outset, can never be transformed into valid search by evidence uncovered). In addition, even if it be assumed *arguendo* that there was reasonable suspicion, still the search was invalid. For suspicion is only one of the requirements that must be satisfied. *See* discussion *infra.*

had marijuana, then they would have had to advise appellee that if he wished to make his intended visit, they would search him. At that point, appellee would have a choice: he could leave without making his visit, as did the mother and brother in *Hunter v. Auger, supra;* or he could decide to go ahead with the visit, in which event the prison officials would be authorized by the Act to search him. But in that event, the search would have to be conducted in a manner appropriate to the particular circumstances.

Cases may be imagined in which the issue to be decided would be the appropriateness of the search. For example, could a male prison official reasonably require that a female who wished to visit an inmate submit to a strip search? Or would the official be required by the Act to resort to some alternative way of ensuring that the female visitor would be unable to smuggle marijuana into the prison, as, for example, a strip search conducted by a matron, or a non-contact visit in which the visitor and the inmate were separated by a solid screen? *See Hunter v. Auger, supra.* Here, however, we do not need to consider any such questions. For here the prison officials never presented appellee with the alternative of leaving without making a visit.

Instead, without any reasonable suspicion that appellee had marijuana, and without permitting him to leave the prison without visiting his brother, they conducted him to the Mud Room and there required him to strip. This conduct was unauthorized by the Act.[8]

In *Commonwealth v. Lapia* the order of the panel, quashing the appeal, is vacated, and the order of the lower court is affirmed.

In *Commonwealth v. Dugger* the order of the lower court is affirmed.

8. Judge WIEAND, in an opinion joined by Judge McEWEN and Judge CIRILLO, would find that appellant consented to the search. Concurring and Dissenting Slip op. WIEAND, J., at 316. However, the judge who saw the witnesses and heard them testify found otherwise, and, as we have explained, *supra* pp. 293–298, since his finding is supported by the evidence, we are bound by it.

CAVANAUGH, J., files a concurring opinion in which MONTEMURO, J., joins.

WIEAND, J., files a concurring and dissenting opinion in which McEWEN and CIRILLO, JJ., join.

McEWEN and CIRILLO, JJ., file concurring and dissenting opinions.

CAVANAUGH, Judge, concurring:

I agree with PART I of Judge Spaeth's opinion which holds that an order suppressing evidence is appealable when it is apparent from the record that the order terminates or substantially handicaps the prosecution. I do so reluctantly since I feel that this is not a good rule, but rather one that is required since as Judge Spaeth points out we have no power to enlarge our jurisdiction by holding appealable an order that precedent has established is not appealable. I believe it is not a good rule since it forces us to do something we have no business doing, that is review a prosecution contention that certain evidence does or does not substantially handicap him in his responsibility as a prosecutor and moreover we do so from a limited record in the sense that we have no idea whatsoever of the facts available to the prosecutor outside the limited record of the suppression hearing. It seems to me that a better rule would be to accept the certification of a public official that in the exercise of his responsibilities he has determined that the absence of the suppressed evidence would terminate or substantially handicap him in the prosecution of the case.

Further, I agree with the conclusion in PART II A that in both of the present cases the suppression order would terminate the prosecution, and therefore both orders are appealable. I also agree with Judge Spaeth's disposition in II B, *Commonwealth v. Lapia,* which affirms the lower court's suppression order.

Finally, as to *Commonwealth v. Dugger* I agree with Judge Wieand, joined by Judges Cirillo and McEwen, and Judge Montemuro joining herein, that the facts of this case support a reasonable suspicion of presence of drugs on the

person of Dugger. However, because of the extraordinarily intrusive nature of strip searches, I would *always* ground such prison visitor searches, which are conducted based on a reasonable suspicion standard, on voluntariness, i.e., they can only be conducted after the visitor has been advised of the alternative of leaving without a visit. Since the lower court found here that Dugger did not voluntarily consent to a strip search I would affirm the order suppressing the evidence, thereby concurring in the result reached by Judge Spaeth.

MONTEMURO, J., joins in this opinion.

WIEAND, Judge, concurring and dissenting:

I join Part I of the Majority Opinion and concur in the affirmance of the trial court's order in *Commonwealth v. Lapia.*

However, I am unable to agree that prison officials in Chester County lacked a "reasonable suspicion" that Billy Dugger was attempting to smuggle contraband into the prison or that the search of Billy Dugger was an unreasonable response thereto. On the contrary, I would hold the search lawful and would reverse the order suppressing the marijuana seized.

The Act of May 11, 1911, P.L. 274, § 4, 61 P.S. § 384, provides as follows:

> The warden or superintendent of the prison is hereby authorized to search or to have searched any person coming to the prison as a visitor, or in any other capacity, who is suspected of having any weapon or other implement which may be used to injure any convict or person, or in assisting any convict to escape from imprisonment or any spirituous or fermented liquor, drug, medicine, poison, opium, morphine, or any other kind or character of narcotics, upon his person.

The statute was enacted because of the substantial interest which the state has in eliminating the smuggling of drugs, knives, guns and other contraband into state penitentiaries

and prisons. To preserve institutional security, prison officials must have discretion to act quickly and decisively. Indeed, it has been said that the governmental interest in detecting and preventing such smuggling activities is so great that it "outweighs the individual interest in perfect justice." *Gettleman v. Werner,* 377 F.Supp. 445, 452 (W.D. Pa.1974).

The statute, of course, must be interpreted consistently with Fourth Amendment guarantees against unreasonable searches and seizures. However, "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of the personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *E.g. United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); (other citations omitted). A detention facility is a unique place fraught with serious dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell v. Wolfish,* 441 U.S. 520, 529, 99 S.Ct. 1861, 1868, 60 L.Ed.2d 447 (1979). The weighty nature of the governmental concern for prison security is a significant yardstick against which "reasonableness" must be measured. In making such an evaluation, moreover, it must be remembered that a potential visitor to a prison or penitentiary does not enjoy an absolute right to enter. A visitor can enter only if permission is granted [1] and may be barred entirely if he or she represents a "threat to the security of the institution." [2]

Chester County Prison officials received information from a telephone caller that Billy Dugger was en route to visit his brother, an inmate at the Chester County Farms Prison. The caller warned that Dugger was carrying uninflated balloons containing marijuana which he intended to deliver

[1]. Act of April 4, 1835, P.L. 232, § 8, 61 P.S. § 630.

[2]. 37 Pa.Code § 93.74(a).

to his brother. However, the caller refused to identify herself. For this reason the author of the lead opinion concludes that it was not "reasonable" to suspect that Dugger was engaged in smuggling marijuana into the prison. There can be no "reasonable" suspicion, the reasoning continues, unless an anonymous caller's warning be corroborated by "circumstances or some indicia of reliability."

"Informants' tips may vary enormously in their value to prison authorities faced with the duty of intercepting drugs or other contraband." *Hunter v. Auger*, 672 F.2d 668, 675 (8th Cir.1982). Thus, it may be that some "tips" are so lacking in urgency, so general, so obviously based on rumor and lacking in indicia of reliability that they can safely be ignored by prison authorities. These require no immediate response. However, their number is relatively few. Most "tips" require a response. Where prison authorities receive an anonymous warning that contraband is then on its way to the prison, they can ignore such a warning only at their peril.

If the urgency of the situation is a determining factor, so also is the specificity of the information received. Thus, the existence of reasonable suspicion may be dependent in part upon the specificity or lack thereof in the information provided. A lack of specificity was weighted heavily against the reasonableness of the suspicion generated by anonymous tips in *Hunter v. Auger, supra.* In the instant case, however, the information was specific. It identified the visitor, who was already en route, and also the inmate being visited. It specified the contraband being smuggled and described the means by which it was concealed, as well as the manner in which it was to be smuggled into the prison. Except for the name of the informant, the factual information imparted to prison authorities was specific, full and complete.

The information thus imparted was also corroborated in part by observations of innocent details made by prison authorities. Billy Dugger, in fact, arrived to visit his broth-

er, an inmate, a short time after the anonymous call. This observation, to be sure, did not corroborate the informant's tip that Billy Dugger was carrying a controlled substance concealed on his person. Such corroboration, in the absence of gross carelessness by appellant, was not immediately available. Moreover, if such corroboration had been obtained, there would no longer have been merely suspicion. Factual corroboration of the type required by the lead opinion would have established probable cause for Dugger's immediate arrest.

The corroborative facts in the instant matter, albeit innocent in nature, were, in my judgment, sufficient under the circumstances to establish reasonable suspicion. Prison officials could reasonably believe that the caller had imparted reliable information which required prompt action to prevent Billy Dugger from smuggling contraband to his incarcerated brother. See and compare: *United States v. Jefferson,* 650 F.2d 854 (6th Cir.1981); *United States v. White,* 648 F.2d 29 (D.C.Cir.1981), *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981); *United States v. Perez,* 625 F.2d 1021 (1st Cir.1980); *United States v. Andrews,* 600 F.2d 563 (6th Cir.1979), *cert. denied,* 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979); *State v. Hasenbank,* 425 A.2d 1330 (Me.1981); *State v. Webb,* 398 So.2d 820 (Fla.1981); *State v. Kea,* 61 Haw. 566, 606 P.2d 1329 (1980); *People v. Tooks,* 403 Mich. 568, 271 N.W.2d 503 (1978); *State v. Barton,* 92 N.M. 118, 584 P.2d 165 (1978); *Radowick v. State,* 145 Ga.App. 231, 244 S.E.2d 346 (1978); *State v. Hobson,* 95 Idaho 920, 523 P.2d 523 (1974); *People v. Taggart,* 20 N.Y.2d 335, 283 N.Y.S.2d 1, 229 N.E.2d 581 (1967). See also: *Commonwealth v. Anderson,* 481 Pa. 292, 392 A.2d 1298 (1978).

When we seek to determine the reasonableness of the search conducted by prison officials we must balance the legitimate governmental interest in prison security against an individual's right to be free from unreasonable searches. *Camara v. Municipal Court,* 387 U.S. 523, 534–535, 87 S.Ct. 1727, 1733–1734, 18 L.Ed.2d 930 (1967); *Common-*

*wealth v. Swanger*, 453 Pa. 107, 111, 307 A.2d 875, 877–878 (1973); *Commonwealth v. Sheridan*, 292 Pa.Super. 278, 285, 437 A.2d 44, 47 (1981), *allocatur granted* April 30, 1982. "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish, supra.* In order to be reasonable a search of a prison visitor must be consistent with the type and circumstances of the visit, the nature of the contraband being sought, and the manner in which the contraband is believed to have been concealed. The type and scope of the search should be commensurate with the difficulty of discovery and the danger that prison security will be breached. To be reasonable, the search must be "related in scope to the circumstances which justified the interference in the first place." *Commonwealth v. Berry*, 305 Pa.Super. 8, 13, 451 A.2d 4, 7 (1982) quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1967).

It has been argued by appellee that a strip search was not reasonable because the Commonwealth failed to prove (1) that appellee intended to have a contact visit with his brother or (2) that a strip search was the least intrusive means to insure that institutional security would be preserved. These contentions do not withstand the light of close examination and analysis. In the first place, Pennsylvania prison regulations provide that all visits shall be contact visits except in exceptional circumstances.[3] With

**3.** 37 Pa.Code § 93.73 provides:
§ 93.73. Number, time, and place of visits.
Inmates shall be permitted to have visits as often as the situation at the institution will allow. Visits shall be of sufficient duration to be of value to both the inmate and visitor. Each inmate and visitor shall be provided a copy of internal visiting rules in accordance with the following:
(1) Visiting days. Visits shall be permitted every day of the year.
(2) Visiting hours. Morning and afternoon visiting hours shall be maintained. Evening visits may be maintained.
(3) Length of visits. Visits shall be of no less than one hour in duration. Longer periods may be allowed depending on inmate's program status and available space.

respect to the intrusiveness of the search, the Fourth Amendment does not require a total absence of intrusion or perfect inoffensiveness. Governmental interest in preventing smuggling into penal institutions, as we have already observed, outweighs the visitor's interest in total, unrestrained freedom. How, then, shall prison authorities respond when there is reasonable suspicion that a visitor is presently engaged in smuggling marijuana into the prison by concealing it in deflated balloons hidden on his person? What type of search will disclose such contraband and yet constitute the least intrusive search? Having considered the relatively few alternatives available, I am persuaded that the strip search conducted by the Chester County Prison officials was reasonable and consistent with Fourth Amendment principles.[4]

> (4) Frequency of visits. One visit per inmate per week shall be permitted. Additional visits may be permitted unless the inmate's program status makes it impractical.
> (5) Number of visitors at one time. The number of visitors an inmate may have at any one time shall be limited to five. A larger number may be permitted depending upon available space.
> (6) Special visit. Provisions shall be made for the approval of a special visit at infrequent intervals of persons who may not be on approved list who have come a substantial distance and for a family visit to a seriously ill or injured inmate. Special visits shall be approved only by the Superintendent or Deputy Superintendent.
> (7) Setting for visits. The setting for visits shall conform with the following provisions:
> (i) Visits shall be held in a relaxed manner under official observation.
> (ii) Visiting rooms shall be set with living room type furnishings.
> (iii) An appropriate outdoor area furnished with picnic tables should also be provided.
> (iv) *The inmate and visitors may embrace when meeting and departing and may sit side-by-side.* The inmate may hold small children on his lap.
> (v) The inmate and visitors may eat or drink items sold at the institution.
> (vi) Family-day visits are encouraged whereby the visitors will be permitted to bring a basket lunch and share it with the inmate. (Emphasis supplied.)

**4.** In *Wool v. Hogan,* 505 F.Supp. 928 (D.Vt.1981), the United States District Court for Vermont upheld the reasonableness of a policy of a state correctional facility which required strip searches of anyone wishing to exercise a contact visit with an inmate.

When appellee arrived at the Chester County Prison, he was requested to move from the visitor's area to a more private part of the prison. There he was told that he was suspected of carrying contraband and would not be allowed to visit his brother unless he submitted to a strip search. Not only did he express no objection to being searched but he actually began to empty his pockets and remove his shoes. If he had wished to avoid the search, he had only to voice his objection and withdraw his request to see his brother. In fact, he did not at any time evidence a desire to terminate his visit or leave the prison without seeing his brother. Under these circumstances, I would hold that appellee consented to be searched. Consent can readily be implied from appellee's failure to object or withdraw his request for a contact visit with his brother. See and compare: *United States v. Sihler,* 562 F.2d 349 (5th Cir. 1977); *State v. Custodio,* 62 Hawaii 1, 607 P.2d 1048 (1980); *State v. Martinez,* 59 Hawaii 366, 580 P.2d 1282 (1978); *People v. Whisnant,* 103 Mich.App. 772, 303 N.W.2d 887 (1981).

Still, we must review the procedure followed by prison officials which resulted in appellant's consent to be searched. Was the search procedure reasonable under the circumstances? In order to be reasonable was it necessary that the search be announced and conducted in the visitor's area? I think not. Was it unreasonable that other, more private portions of the prison were secured by steel doors which were kept locked? The answer is obvious. Would it have been more reasonable to post signs giving advance warning that visitors to the prison were subject to strip searches? Perhaps. However, where a visitor suspected of smuggling marijuana into the prison is told that he cannot visit unless he submits to a strip search, the absence of posted warnings seems a wholly inadequate basis on which to declare the procedure constitutionally unreasonable.

The Act of May 11, 1911, *supra,* as limited by Fourth Amendment guarantees, authorizes prison officials to conduct a reasonable search of any visitor reasonably suspect-

ed of attempting to smuggle contraband into the prison. The Chester County Prison authorities possessed reasonable suspicion that appellee was smuggling marijuana to his brother in the prison. Therefore, they were authorized to conduct a reasonable search of appellee's person to protect and preserve the security of the prison. The only realistically effective search calculated to disclose a small amount of drugs was a strip search. To hold that prison authorities may not conduct a strip search of a visitor reasonably suspected of concealing drugs upon his person would, in effect, prevent prison authorities from intercepting any small, easily concealed contraband that a visitor wished to introduce into the prison. The Constitution does not require such a result. I would hold that the strip search of Billy Dugger was lawful. It was a reasonable response to a reasonable suspicion that he was smuggling marijuana into the prison.

In the Dugger case, therefore, I would reverse and remand for further proceedings.

McEWEN and CIRILLO, JJ., join in this opinion.

McEWEN, Judge, dissenting and concurring:

I would hold as follows:

The order of suppression in both cases is appealable. I do not so conclude by reason of any joinder with the majority that the substantial handicap to the prosecution is apparent on the record. Rather, I agree, subject to the exception hereinafter noted, with the majority expression of this court by our esteemed colleague Judge Gwilym A. Price in *Commonwealth v. Deren*, 233 Pa.Super. 373, 337 A.2d 600, 602 (1975), that:

> [W]hen the District Attorney from one of the counties of this Commonwealth directs an appeal from the suppression of evidence, we must accept such an appeal as the Commonwealth's good faith certification that the case will be terminated or substantially prejudiced by such an order, and [we should] determine only if the suppression was proper.

318

I JOIN in that portion of the opinion of the distinguished Judge Edmund B. Spaeth, Jr. that affirms the order of suppression entered by the Common Pleas Court in *Commonwealth v. Lapia.*

I JOIN in the dissenting opinion of the learned Judge Donald E. Wieand that the strip search of Billy Dugger was lawful and would direct that the order entered by the Common Pleas Court in *Commonwealth v. Dugger* be reversed and the case remanded for further proceedings.

I propose to address but one issue, namely, the basis for my conclusion that we should accept any appeal undertaken by the Commonwealth from an order of suppression of evidence, subject to the exception we shall hereinafter discuss. While the careful, thoughtful majority expression by our eminent colleague, Judge Spaeth, provides a fine exposition of position upon this question, I must, nonetheless, very respectfully, dissent.

Any analysis of this issue must commence with a study of the decision of our Supreme Court in *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304, *cert. denied,* 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963). It there became clear that an appeal will lie if the order of the suppression of evidence will result in termination of the prosecution *or* in a handicap to the Commonwealth. *Id.* 411 Pa. at 63, 190 A.2d at 308. It would seem that any appeal from an order of suppression by the Commonwealth must fall into one of the following categories:

The order of suppression will result in a termination and conclusion of the prosecution.

While the order of suppression will not result in a termination or conclusion of the prosecution, the Commonwealth will be substantially handicapped because it cannot present all of its available evidence *and* the nature of that handicap *is apparent* from the record.

While the order of suppression will not result in a termination or conclusion of the prosecution, the Commonwealth will be substantially handicapped because it can-

not present all of its available evidence *and* the nature of that handicap *is not apparent* from the record.

Our study here focuses upon the third category. The effect of the majority opinion upon such cases will be to uphold, without appellate review, the validity of an order of suppression and thereby force the Commonwealth to proceed to trial without all of its available evidence.

The Supreme Court in *Bosurgi* addressed as one class the aforementioned second and third categories which it referred to as "the second situation" and described the handicap resulting from the suppression order as "not so apparent [but] nevertheless present". The sole focus of the attention of the court seemed to be the anomaly of forcing the Commonwealth to proceed to trial in *any* situation without the benefit of appellate evaluation of a trial court restriction upon the presentation of available evidence. We especially note that the court did not draw a distinction between an appeal where handicap *is* apparent of record and the appeal where the handicap *is not* apparent of record but, we reiterate, the Supreme Court treated this exception to the interlocutory appeal rule as applicable to the entire group. I am not satisfied that this court should subdivide a class of appeals which twenty years ago received such close scrutiny of the Supreme Court, when that court itself has not been willing, neither then nor since, to create the exception the majority here carves. As I contemplate the precise language of the opinion, and the procession of the majority to its conclusion, I am drawn from the march by the appeal of the practical and by the echo of the fervent remarks afforded by the Supreme Court to that portion of *Bosurgi* which addressed this class of appeal:

In the second situation, although the element of finality in the order is not so apparent, it is nevertheless present. Without a right of appeal in the Commonwealth in the second situation, the Commonwealth is completely deprived of any opportunity to secure an appellate court evaluation of the validity of the order of suppression which forces the Commonwealth to trial without all of its

evidence. The evidence suppressed may well mark the difference between success and failure in the prosecution; to deny the Commonwealth its only opportunity of securing an appellate review to determine whether the evidence was properly suppressed is highly unfair to the Commonwealth and the interests of society which it represents. In our zeal to protect and preserve for the accused every constitutional right to which he is entitled we too often forget and neglect to preserve the rights of society which, too, are entitled to consideration. An appellate review of the validity of the order of suppression cannot harm the defendant whereas the denial of the right to such review does harm the Commonwealth. In both factual situations the practical effects of an order granting the suppression of evidence give to the order such an attribute of finality as to justify the grant of the right of appeal to the Commonwealth in both situations. *Id.* 411 Pa. at 63, 190 A.2d at 308.

There can be no doubt that each notion and every phrase of this concerned view of the Supreme Court is just as applicable to the appeal where the handicap is not apparent of record as it is to the appeal where the handicap is so apparent.

The majority correctly notes that the *Bosurgi* decision "did not address the question of how an appellate court is to determine whether an order suppressing evidence terminates or substantially handicaps the prosecution". (slip opinion at p. 4). However, I am not able to agree that *we* may proceed to such a task by pronouncing a distinction in a class of appeal when the Supreme Court itself failed to measure that class for any such distinction, even after it afforded the class not only careful study but also intense expression. While it may well be our role to implement an opinion of the Supreme Court by prescribing a course for the conduct of such appeals, such implementation should be consistent with the holding of *Bosurgi*. The *Deren* decision is, of course, certainly consistent with the distress ex-

pressed by the Supreme Court that *any* prosecution be conducted without appellate review of a trial court decision that narrows the evidence to be presented; on the other hand, the majority holding upon this issue, in my view, is not so consistent.

While the majority states the Supreme Court has always made its determination in such cases solely on the basis of the record, the majority concedes that in some cases the Supreme Court has not specifically acknowledged the record as the basis of the determination before concluding that nothing in those cases suggests that the court went outside the record. It is to be noted, however, that the cases cited by the majority were all appeals in which the initial determination of the Supreme Court was the existence of handicap. The fact is that there are no decisions by the Supreme Court that hold the appeal shall not be heard if the handicap is not apparent of record. Nor, in our view, does *Commonwealth v. Hill,* 497 Pa. 230, 439 A.2d 1153 (1982) so hold. The complete per curiam opinion of the court there reads:

> PER CURIAM The appeal of the Commonwealth at No. 286 January Term, 1979, is quashed, as we do not believe the order suppressing the weapon substantially impairs the Commonwealth's case. *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963). Furthermore, despite the trial court's certification, we refuse to accept the interlocutory appeal of the accused and we thus dismiss the appeal at No. 307 January Term, 1979.

A study of *Hill* does not enable us to determine whether the court there quashed the appeal because (1) the record made clear that the Commonwealth was not actually handicapped by the suppression order, or (2) because the handicap was not apparent of record. Suppose, for example, an accused petitions the court to suppress six of his own inculpatory statements; suppose, further, that the trial court suppresses one of those statements but refuses to

suppress the remaining five and the Commonwealth appeals the order of suppression of the one statement; it is then quite possible for the appellate court to quash the appeal for the reason that it is clear from the record itself the Commonwealth is not handicapped. In such a situation, we see from the record that the handicap of the Commonwealth is not substantial and while the presentation may be somewhat impaired, the record reflects that the remaining evidence is such that the prosecution is not actually handicapped by the suppression order. The court should quash such an appeal and such a disposition is quite consistent with *Bosurgi*. However, it is quite another matter for an appellate court to quash an appeal when that court cannot know—because it is unable to determine from the record— the magnitude of the harm that the order of suppression inflicts upon the trial presentation of the Commonwealth. It is my view that the decision of the majority upon this issue is too significant and the result of that decision too awesome to be permitted to rest upon an inference from cases where the Supreme Court found handicap in the record or to rest upon the equivocal nature of the *Hill* decision.

If it is fairness we seek, unfairness can be avoided by reliance upon the *Deren* standard that would accept an appeal by the district attorney as a "good faith certification" that the order of suppression is a handicap to the prosecution, subject to the right of the court to quash the appeal where the record reveals the Commonwealth is not handicapped by the order of suppression. If, in such a situation, counsel for the accused is inclined to the view that the district attorney is not handicapped by the suppression order, counsel may utilize a motion to quash and thereby force the Commonwealth in a responsive pleading to demonstrate the handicap—a procedure that adequately protects the Commonwealth when the handicap is actual, while enabling the dismissal of the appeal where the alleged handicap is specious.

The majority notes the clearly established principle that we will not consider, in determining if an appeal is interlocutory, any statement not supported by facts of record. I share the goal of consistency but hasten to note that the *Deren* standard can hardly be termed inconsistent since, in all of the situations cited by the majority, there was presumably a complete record available for appellate review, while in the classification we here study, as noted in the opinions of our distinguished colleagues, Judge James R. Cavanaugh and Judge Vincent A. Cirillo, the record available for our review can only be quite limited.

The majority opinion upon this issue concludes with the message that "we leave to the Supreme Court whether the law should be changed". (at p. 279). While the majority here refers to a rule of appellate procedure, I would urge a similar hesitancy with regard to the change in the substantive law which, I very respectfully contend, is effected by the majority opinion.

And, finally, the majority recognizes that a forcible argument may be made that as a matter of policy the Commonwealth should be permitted to appeal a suppression order in a case where the handicap does not appear of record. The earlier quoted spirited statement of the Supreme Court is just such an argument:

> The evidence suppressed may well mark the difference between success and failure in the prosecution; to deny the Commonwealth its only opportunity of securing an appellate review to determine whether the evidence was properly suppressed is highly unfair to the Commonwealth and the interests of society which it represents. In our zeal to protect and preserve for the accused every constitutional right to which he is entitled we too often forget and neglect to preserve the rights of society which, too, are entitled to consideration.

That argument is to my mind not only forcible, but is somewhat a plea, and is certainly quite convincing. I am, therefore, compelled to this dissent.

CIRILLO, Judge, concurring and dissenting:

I concur in the result reached by the majority in *Commonwealth v. Lapia*, and I respectfully dissent from the majority holding in *Commonwealth v. Dugger*. Initially, I express my view that the holdings of this Court in *Commonwealth v. Trefry*, 249 Pa.Super. 117, 375 A.2d 786 (1977), and *Commonwealth v. Deren*, 233 Pa.Super. 373, 337 A.2d 600 (1975) should remain extant.

The majority concludes that we must determine for ourselves, on the basis of the record alone, whether an order suppressing evidence is appealable. The record of a suppression hearing, though, contains only the evidence adduced at the hearing, which is limited to a determination of whether specific evidence was obtained in violation of the defendant's rights or any statutory provision.[1] The Commonwealth does not present its full case at a suppression hearing or make arguments for conviction. Thus, frequently it cannot be ascertained from the suppression record what other evidence, if any, is available to the Commonwealth. Therefore, in many cases, it would be impossible to

1. Under the provisions of Pa.R.Crim.P. No. 323 (given below in pertinent part), the record of a suppression hearing is limited as follows:

 (a) The defendant or his attorney may make a motion to the court to suppress any evidence alleged to have been obtained in violation of the defendant's rights.

 . . . .

 (g) A record shall be made of all evidence adduced at the hearing. The clerk of court shall impound the record and the nature and purpose of the hearing and the order disposing of the motion shall not be disclosed by anyone to anyone except to the defendant and counsel for the parties. The record shall remain thus impounded unless the interests of justice require its disclosure.

 (h) The Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights. The defendant may testify at such hearing, and, if he does so, does not thereby waive his right to remain silent during trial.

 (i) At the conclusion of the hearing, the judge shall enter on the record a statement of findings of fact and conclusions of law as to whether the evidence was obtained in violation of the defendant's rights, or in violation of these rules or any statute, and shall make an order granting or denying the relief sought.

determine from the record whether an order suppressing evidence does in fact terminate or substantially handicap the prosecution. *See: Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304, *cert. denied,* 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963).

Furthermore, in determining whether an order suppressing evidence is appealable, we must keep in mind the following:

> In our zeal to protect and preserve for the accused every constitutional right to which he is entitled we too often forget and neglect to preserve the rights of society which, too, are entitled to consideration. An appellate review of the validity of the order of suppression cannot harm the defendant whereas the denial of the right to such review does harm the Commonwealth.

*Commonwealth v. Bosurgi,* 411 Pa. at 63, 190 A.2d at 308.

Unless the record affirmatively shows the availability of other evidence to the Commonwealth, which is sufficient to obtain a conviction, we must assume that the Commonwealth would be prejudiced by the suppression of evidence.[2] Otherwise, we would have to remand to the lower court for a more complete record, consequently expending already overtaxed judicial time and resources as well as depriving the defendant of his constitutional right to a speedy trial.

By accepting such an appeal as the Commonwealth's good faith certification that the case will be terminated or substantially prejudiced by a suppression order, we remain within the ambit of *Bosurgi,* we follow the precedent set by the Court in *Deren* and *Trefry,* and we provide a procedure for appeal which benefits all of society, not just the criminal defendant.

In *Commonwealth v. Dugger,* I join in the well-reasoned Dissent of Judge Wieand.

**2.** *See: Commonwealth v. Thorne,* 223 Pa.Super. 122, 130, 299 A.2d 370, 373–74 (1972) (Cercone, J., dissenting).